**Lucille Marie MIRANDA, Appellant,**

v.

**Donald V. MIRANDA, Respondent.**

**No. WD 30422.**

Missouri Court of Appeals,
Western District.

March 3, 1980.

Ronald R. Holliger, Kansas City, (Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, of counsel), for appellant.

Michael J. Albano and Michael W. Manners, Independence, (Paden, Welch, Martin, Albano & Graeff, Independence, of counsel), for respondent.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

PRITCHARD, Judge.

In this appeal from a decree of dissolution of marriage, the issues are whether the trial court properly divided the marital property, and in particular in connection therewith, whether the family-owned corporation was correctly evaluated for division of property; and whether the trial court properly denied appellant-wife maintenance.

The parties were married December 31, 1949. Three children were born of the marriage two of whom were emancipated, and the custody of the younger daughter was awarded appellant, along with a child support award of $30.00 per week.

Since 1965, the parties were jointly engaged in a corporate enterprise, Li'l Guy Foods, Inc., which manufactured and distributed various Mexican food products. Appellant owned 49% of the stock and respondent owned the balance, 51%. Appellant became active in the business in 1968, working on the production line when needed and in supervising help. Later she began doing part of the business paperwork in checking route books, invoices, and checking in drivers. Appellant's hours varied, but she testified that both parties worked in the business often ten to twelve hours a day. Although respondent denied it, appellant testified that she tested and modified recipes used in the products. The business prospered so that it was able to pay $41,600 as combined executive salaries to the parties, although that amount is not readily apparent from a four-year work sheet of income and adjustments, Exhibit 7.

The parties purchased a building for $140,000.00 in 1976 at 2340 Vernon Street in North Kansas City, which was leased to the corporation at $1,000.00 per month. At the time of trial, the corporation was behind $12,000.00 in lease payments.

As to the valuation of the corporate business, appellant's witness, James Harkins, a C.P.A. with experience in valuing corporate stock, testified that he examined corporate financial statements and tax returns for four years prior to March 31, 1977, and used a capitalized earnings method for his valua-

tion on the average of adjusted earnings. He then used a multiplier of 7, which would return about 14% yield on investment, which he testified would be appropriate for this type of business. Using this method, Harkins came up with a valuation of about $165,000.00. In arriving at that figure, Harkins adjusted upwards the earnings because appellant's duties could be done on a part-time basis, about 20 hours a week for an annual salary of $5,200.00, rather than the $20,800.00 she was paid; her social security payments would have been saved; he removed the depreciation and expenses on respondent's personal automobile; he removed non-recurring moving expenses; donations; and non-business type entertaining. He relied upon information given him by appellant's counsel as prepared by the corporation's accounting firm, Wright, Herford and Sanders. He acknowledged that he did not get general ledger information, which would have raised or lowered his valuation; if the information given him was erroneous, it is possible that the appraisal was too high; and he did not take into account the business year, March 31, 1977 through March 31, 1978, because they were not made available to him until the day of trial. [Defendant's Exhibit 10 indicates that from April, 1977 to March, 1978, there was a loss of $16,506.74.]

Respondent's witness, Lawrence D. Ashley, a lawyer and a C.P.A., testified that he reviewed the corporate tax returns and financial statements for the past five years. He also inspected the plant and equipment. There was no established market value for this type of stock. Based upon the book value method, Ashley arrived at a valuation of $60,000.00; and on the capitalized earnings method, which was basically the same as that used by Harkins, he arrived at a value of $44,000.00. Both of these methods are widely used for valuing businesses, but the capitalized earnings was preferable to use. Ashley testified that his method differed from Harkins in that he used a 15% discount factor because of lack of marketability; and he used a lesser adjustment for replacement of appellant's duties as well as raising respondent's salary for his duties.

He used the same multiple of seven as applied to net earnings.

Otto Paul Mertens, C.P.A., had handled the records for Li'l Guy Foods, Inc., since 1970, he being associated, and later a partner, with Wright, Herford and Sanders, in Independence, Missouri. He evaluated the corporate business using its figures setting out its financial status as of March 31, 1978, for one figure, $67,587.29, but for the prior year (1977), his evaluation was $81,183.58. The method he used is known as the Hostead formula, which is used extensively by the Treasury Department. The earnings are "broken down between a factor that's related to a return on investment and a return on good will. The return on investment is subtracted from an average net earnings for a five-year period. The residual earnings then *is* capitalized, to determine the value of the good will of the corporation. This value of good will is then added to the book value of the corporation, to arrive at a total value of the corporation, which then is discounted for certain items, in this case, lack of marketability." Mertens' method differed from the other two accountants (Harkins and Ashley) in that they used earnings solely as a value for consideration of capitalized earnings, while he gave effect to the book value of the corporation, "plus capitalized good will—or capitalized earnings to arrive at a good will factor." Defendant's Exhibit 13, although offered, was not received in evidence during the first hearing, but Defendant's Exhibit 9, which Mertens prepared using Exhibit 13, was received in evidence. Because of a dispute as to the production of Exhibit 13, the court recessed until June 12, 1978. Mertens was excused subject to being recalled.

Upon resuming, Harkins again took the stand. After the first hearing, he and Ashley were asked to go to the corporate premises and examine the records at that location to see if there had been any misstatement of income and earnings which might affect the valuation. Ashley and he were of the opinion that a formal audit was not necessary because it would have been time-

consuming. In examining the records of gross sales, upon which commissions were paid drivers, they determined for the three years there were differences: in 1975, $10,251; in 1976, $4,942; and in 1977, $10,252. These figures do not reflect in-house sales or expenses of drivers, Harkins and Ashley believing those items would offset each other. They made adjustments for personal use of a company automobile, entertainment expenses, moving expenses, salaries for both parties, F.I.C.A. taxes for appellant, and apparently an increase in gross sales as computed from drivers' commissions. The income was averaged for five years, applied the factor "for sales that may not have been reported, used a multiplier of 7, a marketability discount of 15%, and arrived at a value of approximately $136,000." The sales reported by the corporation were from bank deposits, not from drivers' sales and commissions paid. The difference was unexplained.

The parties agreed at trial that certain personal property was non-marital, jewelry, a mink stole and coat, and agreed also that this designated property be distributed to the parties. The court incorporated that agreement in its decree, but no value was placed on any of the property by the parties in the evidence. The parties agreed to the identity of the marital property and as to some of its value. The court by decree set off property as follows: To appellant: the marital residence [value $55,000, debt $26,416.28]; 1973 Mercedes automobile [value $11,000.00]; 1975 Mustang [value $3,000.00, debt $2,582.44]. Appellant was ordered to pay all the debts thereon, and to pay respondent $14,500.00 for his one-half of the equity in the residence. Respondent was given all the corporate stock, which the court valued at $81,200.00, and was ordered to pay appellant $40,600.00 for her one-half of the corporate business, less $14,500 for respondent's one-half of the equity in the residence, making a total of $26,100.00 to be paid her in 60 installments of $435.00 per month. The property which had been rented to the corporation was set off to respondent, and he was ordered to pay appellant $24,000.00 for her one-half interest in the equity in 60 installments at $400.00 per month. (No interest on these monthly payments was provided.) A 1977 Cadillac [value $7,000.00, debt $5,000.00]; and a sailboat and trailer, which the court valued at $600.00, was set off to respondent, he to pay $300.00 to appellant for her one-half interest therein. Two retirement accounts, $3,000.00 each, in the individual names of each, were set off equally to the parties. The furniture in possession of each was set off to them. This division resulted in these total amounts of property set off to each: $93,402 to appellant, or about 53%; and $84,485 to respondent, or about 47%.

■ Appellant's Points I and II that there was no substantial and competent evidence to support the trial court's valuation of the corporate stock, and that that determination was against the weight of the evidence, are ruled against her. First, the testimony of Mertens, he being an expert witness, was competent, and the trial court was authorized to accept his testimony as to what the corporation was worth to the exclusion of the other two witnesses, Harkins and Ashley. Mertens was the corporate C.P.A., and had been doing accounting work for the corporation since 1970, and certainly, as the trial court could have found, he was familiar with it operation. Although appellant complains that Mertens did not give a "book value" which he used in part in arriving at his opinion as to market value, he did testify that he used book value as well as capitalized earnings, the latter (Exhibit 9) coming from corporate records. Either party had the opportunity to recall Mertens when the hearing resumed, and if appellant had done so, she could have explored the bases for Mertens' valuation. On the other hand, it not being pointed out how Harkins' original method of evaluation was superior to that of Mertens, and upon rehearing, Harkins reduced his valuation and Ashley increased his, based, as Harkins testified, on increased sales based upon drivers' commissions—a fact which was not explained. In *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245 (Mo.1968), the problem was the estab-

lishing of fair value in a "close corporation" at the instance of a dissenting minority shareholder. The plaintiff contended that the trial court erred in admitting the opinion evidence of defendant's witnesses, urging that they did not constitute evidence of fair value under the statute because they had no previous experience in valuing a food brokerage business and their opinions were based on insufficient data and were not supported by sufficient reasons. The court said, page 254[12], "In this case tried without a jury, the value of the testimony of Mr. Cook and Mr. Baum and the methods and standards used by them must be determined according to the credibility of the witnesses and the probative value of the evidence. The questions of fact presented were for the determination of the trial judge and are subject to review by this court. The trial court did not err in admitting the evidence in these circumstances." And at page 255[13], "The judicial determination of value must be an informed judgment, but 'fair value' is not susceptible of determination by any precise mathematical computation and no one formula or figure is binding or conclusive. (Citing cases.)" Applying the standards of the *Flarsheim* case, it cannot be held that the trial court erred in finding the value of the business to be $82,000.00, and in giving weight to Mertens' testimony.

The trial court could believe under the evidence that both parties were guilty of marital misconduct as that might affect the division of property under § 452.-330(1)(4), RSMo 1978. Respondent had struck appellant on about four occasions, the last occurring in 1977. Appellant had, on the other hand, engaged in drinking excessively, and remaining away from home until the early hours of the morning. Without detailing the evidence, showing much bickering and quarrelling, there is little evidence to show that one party was more at fault than the other. Certain unvalued non-marital property was set off to each party. Although respondent will retain the family business, and presumably will continue to operate it and receive its profits, it would have been speculative to have fixed a value of the profits at the time of trial. (Exhibit 10 shows that the business sustained a loss from April, 1977 to March, 1978.) From any profits, or earnings, respondent must pay off appellant's interest in the business and real estate at $835.00 per month. Aside from the ability to be employed, discussed below in connection with the issue of maintenance, the division of property does not seem to be disparate in consideration of the economic circumstances of the parties. As noted, appellant received about $9,000.00 in property more than respondent.

Plaintiff's Exhibit 8, attached to the petition, sets forth that appellant then stated her needs to be $1,333.00 per month, including $230.00 for the needs of the minor daughter. She increased the amounts needed for house repairs, and certain other expenses, in her testimony at trial, but in no precise total amount. The trial court disallowed her maintenance, finding that she had sufficient property to provide for her reasonable needs and was able to support herself through appropriate employment. The payment by respondent for appellant's marital interests does not generate any income. None of her other property is income-producing. Appellant should not be required to use up her marital property, set off to her, to provide for her maintenance needs. In *Brueggemann v. Brueggemann*, 551 S.W.2d 853, 857[5] (Mo.App.1977), it was said, "In terms of an award of property replacing an award of maintenance, however, the focus of our statute seems more specifically on income-producing property, see *Nixon v. Nixon*, 525 S.W.2d 835, 838 (Mo.App.1975)." Here, prior to dissolution, appellant's sole income was $20,800.00 per year (a like amount was received by respondent) from the operation of the family business. Since respondent was awarded the business, that source of income is removed from appellant, while respondent will have the full benefit of income from the business. The inquiry as to appellant's needs was insufficient in terms of the statutory standards. As to this issue, there should be further proceedings to determine with spec-

ificity: (1) whether in fact the property set off to the appellant, including its possible income, would provide for her reasonable needs; (2) whether appellant can support herself through appropriate employment (considering her age, and the possibility of similar employment to that of the family business in which she participated since about 1968); (3) appellant's total financial resources and her ability to meet her needs independently; (4) the time required, if so, for appellant to acquire sufficient education or training to find appropriate employment; (5) consideration of the standard of living established during the marriage; and (6) the ability of respondent to meet his needs while meeting those of appellant.

As to the judgment denying appellant maintenance, it is reversed and the case remanded for further proceedings in connection therewith. In all other respects, the judgment is affirmed.

All concur.