Anne C. THILL, Appellant,

v.

Ronald E. THILL, Respondent.

No. WD 57151.

Missouri Court of Appeals,
Western District.

May 31, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 1, 2000.

Application for Transfer Denied
Oct. 3, 2000.

Jean Goldstein, Columbia, for appellant.

Paul Trees Graham, Jefferson City, for respondent.

Before EDWIN H. SMITH, Presiding Judge, VICTOR C. HOWARD, Judge, and RONALD R. HOLLIGER, Judge.

RONALD R. HOLLIGER, Judge.

Anne Thill ("Wife") appeals a Judgment and Decree of Dissolution of Marriage entered on March 22, 1999 dissolving her eighteen-year marriage to Ronald Thill ("Husband"). Wife raises six points on appeal. Two points deal with the valuation made by the court of Husband's interest in two closely held corporations; Wife attacks the calculation of Husband's income for child support purposes; she contends the court erred in making an unequal distribution of property based on a finding of her misconduct; she claims the court erred in denying her attorney's fees; and in her last point, she claims error in the omission and valuation of several other pieces of property. Wife does not appeal the grant of maintenance to her or the custody determinations for their two children. We affirm in part and reverse in part for further proceedings.

## BACKGROUND

Husband owns 49 percent of the shares of two "Subchapter S" corporations,[1] CSPI, Inc., Missouri ("Mo.Corp.") and CSPI, Inc., Delaware ("Del.Corp."). There is one other shareholder. Husband is also a member of two partnerships which own real estate. One partnership owns the office building used by the two corporations and a residence built for Husband after his separation from Wife. The other partnership owns hangars at the Jefferson City airport, where planes used in the Husband's business are housed. No error is alleged with regard to the valuation of the partnerships.[2] The parties also own a farm, where Wife and the children continue to live; Wife stables some horses there, including show horses ridden by their daughter; the parties own various other property which will be discussed only as relevant to a particular issue.

Mo. Corp. sells and maintains computer hardware and software for the small banking industry with customers in at least a dozen states. To more efficiently service its customers, Mo. Corp. flies it employees by private planes to the various sites. Del. Corp., the owner of those airplanes, was established for the sole purpose of owning and operating the planes.

Husband was ordered to pay Wife $1,443.68 per month for the support of their two children. He was also ordered to pay Wife $1,000 per month for maintenance for a period of three years. The court's judgment found Husband's income to be $12,123.92 per month and imputed income to Wife of $700 per month. The court prepared its own Form 14 using an income figure, however, of $10,877.92 for Husband. The court also gave Husband a Line 10 overnight visitation credit of 10

---

1. Subchapter S is a tax status provided certain corporations under the Internal Revenue Code. Although not completely identical, the tax treatment is substantially like that afforded a partnership. IRC (1954) Secs 1361–1379; 26 U.S.C.A. §§ 1361–1379; O'Neal & Thompson, O'Neal's Close Corporations; § 2.06 (3rd Ed).

2. R & B Properties was valued by the court at $14,000 for the airplane hangers. Wife suggested a value of $55,000 for Husband's interest. The court has been unable to find in the record any evidence that supports the value ascribed by the court. No claim of error is raised regarding this discrepancy.

percent based on a basic child support amount of $1,726.

The trial court also made a disproportionate division of the marital property based on an express finding that Wife had committed marital misconduct. Husband was awarded 60 percent of the marital assets.

## STANDARD OF REVIEW

■ Our review is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the trial court's judgment unless it is against the weight of the evidence, it is not supported by the evidence or it erroneously declares or applies the law. *Id.* The trial court is permitted great flexibility in its division of marital property. *Woolridge v. Woolridge*, 915 S.W.2d 372, 376 (Mo.App.1996). The trial court is free to believe or disbelieve all, part, or none of the testimony given by any of the witnesses. *Price v. Price*, 921 S.W.2d 668, 671 (Mo.App.1996). Evidence and favorable inferences are accepted and contrary evidence disregarded. *Welker v. Welker*, 902 S.W.2d 865, 867 (Mo.App. 1995).

## VALUATION OF THE CLOSELY HELD CORPORATIONS

■ Valuation of the stock of a closely held corporation is a difficult matter. *Hoffmann v. Hoffmann*, 676 S.W.2d 817, 826 (Mo. banc 1984). In a dissolution proceeding, the object of any valuation of a business is, of course, to determine its fair market value for purpose of application of

the equitable distribution rules to arrive at a fair property division. The very attributes that simplify valuation of publicly held stock, a ready market and historical sales record, are absent with a closely held corporation.[3] Value is a determination of fact by the trial court, to which we give great deference. *In re Marriage of K.B.*, 648 S.W.2d 201, 206 (Mo.App.1983). No one formula or method of determining value is binding or conclusive. *Miranda v. Miranda*, 596 S.W.2d 61, 65 (Mo.App.1980). "The judicial determination of value must be an informed judgment, but fair 'value' is not susceptible of determination by any precise mathematical computation ...." *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245, 255 (Mo. 1968). Generally, therefore, the trial court can accept the opinion of one expert as to value over another and can prefer one method of valuation over competing methods based on the particular facts of the case and the circumstances of the corporate entity involved. *Id.* There are a number of various valuation methodologies which fall within one of the following broad categories: (1) earnings approach; (2) liquidation ("underlying asset") approach; and (3) comparable sale approach. Some experts may, in fact, use some combination of these approaches.[4]

■ Husband retained as an expert witness James Marberry. He used a discounted capitalized excess earnings method[5] and a comparable sale method. He indicated that there were difficulties inherent in and specific to the comparable sale

---

3. A closely held corporation is characterized by (1) a small number of shareholders, (2) lack of a ready market for the stock and (3) substantial participation in business operations by the stockholder. *See* O'Neal, *supra* at § 1.02.

4. For a more detailed discussion of the most common methods, *see* O'Neal, *supra* at § 7.26 and other authorities cited in footnote 1 to that section.

5. Marberry's method involved (1) computation of the average net worth of the company

weighted on a sum of the years digit method, (2) calculation of the average net income again using a weighted sum of the years digit method, (3) calculation of the rate of return on the average net worth, (4) expected rate of return was subtracted from average net income to arrive at gross earnings attributable to goodwill, (5) calculation of the gross earnings attributed to goodwill capitalized at a rate of 25%, (6) liabilities are subtracted from assets and that product is added to the goodwill value to arrive at a total valuation before applying any discounts.

method in this case. As the value he opined was higher, and he believed more reliable, under the earnings method, that was the method he found preferable. Marberry testified that the value of Mo. Corp. was $775,399 before determination of Husband's interest. He believed, however, that value should be further adjusted to reflect a lack of marketability ("marketability discount")[6] and Husband's minority interest in the corporation ("minority discount").[7] The discount percentages he used were 34 percent and 30 percent, respectively. He thus calculated Husband's interest to be worth $175,535 as of a date (based on then available information) approximately one year before trial. By later supplemental testimony, using 1998 data, he arrived at a final opinion of the value of Mo. Corp., and that Husband's interest was $159,265.

Wife also presented expert testimony, through Leslie Lorts. Like Marberry, he also used the excess earnings method. He agreed that marketability and minority discounts should be applied, but utilized different figures than Marberry—20 percent and 15 percent, respectively. He concluded that, as of December 31, 1998, Husband's interest in Mo. Corp. had a value of between $845,253 and $1,264,834.[8]

Both experts used weighted net average income figures in their methods, although with slightly different weights and a one-year difference in the start year. The most substantial difference in *methodology* was Marberry's use in valuing Mo. Corp. of the depreciation on the airplanes owned by Del. Corp. Marberry deducted this depreciation from Mo. Corp.'s earnings in making his calculations. Both experts' opinions were admitted without objection. It is the use of Del Corp.'s depreciation to reduce Mo. Corp.'s earnings, and therefore value, that leads to Wife's first point on appeal.

■ Wife first argues that the trial court erred in valuing Mo. Corp. because the valuation accepted from Husband's expert used tax losses from the separate Del. Corp. to reduce the value. Specifically, Wife complains the net operating losses and depreciation from the Del. Corp. were used by the expert in determining the Mo. Corp.'s fair market value. She claims this was improper both for the reason that they were separate legal and tax entities, and because downward adjustments for depreciation were not justified because the depreciation was a "paper loss" and the airplanes had actually maintained their value, if not appreciated.[9] Husband argues in response that it was proper to adjust Mo. Corp.'s value by use of the Del. Corp.'s operating losses and depreciation because the two corporations were essentially integrated by function and that the only reason for maintaining separate corporations was to enhance the appearance

6. A "marketability discount" is used to reduce the value to reflect that there is no established public market for the shares of the entity. As a result, the shareholder's investment is less liquid or more difficult to sell or liquidate. This liquidity adjustment will vary depending upon the type of business and the opinion of the valuation expert.

7. A "minority discount" is intended to reflect that a minority shareholder does not have sufficient shares to exercise legal control of the corporation, a buyer would therefore pay less for shares that did not constitute a majority interest. Again, the percentage of this adjustment will vary.

8. Lorts actually arrived at three different valuations depending upon whether certain adjustments were made for excess officer's compensation and deferred income. Marberry considered such adjustments but did not find them appropriate. It seems obvious that the trial court rejected those adjustments, as it was entitled to do. *Flarsheim*, 432 S.W.2d at 255. For purposes of our analysis, we use the lower, unadjusted figure to compare the two opinions and consider Wife's arguments.

9. There may be a difference between tax depreciation and true economic depreciation. The tax code may, under various provisions, allow for depreciation for tax purposes on an accelerated basis that is less than the reasonable useful life of the property. In such an event, the actual depreciated value of the asset exceeds the tax depreciated value.

of Mo. Corp.'s balance sheet to its customers.[10]

■■■■ Neither party has favored us with any authority, legal or accounting, supporting or rejecting the treatment or use of the Del. Corp.'s operating loss and depreciation by Husband's expert in this case. In fact, Wife's expert testified he would have no particular objection to consolidating the income statements and balance sheets of the two corporations. He disagreed, however, with Marberry's consolidation since it was only partial. Marberry did not utilize, at a minimum, Del. Corp.'s *assets* as well as operating losses and depreciation. To have included those assets along with the actual assets of Mo. Corp. would certainly have increased his valuation.[11] The parties spend considerable time arguing whether depreciation is an economic or tax loss. Wife argues that, where the asset subject to tax depreciation is actually increasing in value, then depreciation should not be used in calculating the going concern value of a business.[12] Husband disagrees and argues that the tax depreciation represents a figure for determining the replacement cost for the asset.[13] Again, in the absence of some evidence as to controlling authority, we cannot approve or disapprove of that distinction as a matter of law but find it to be a question of fact for the trial court. We do, however, find that it was illogical and un-

reasonable for the trial court to base its valuation on only a partial consolidation of the finances of the two corporations. In fact, Husband's expert, Marberry, in his written report stated that "the tangible assets of CSPI Delaware *should* be considered in the overall valuation and the losses be considered in the computation of net income." (Emphasis added). Inexplicably, the calculations introduced into evidence apparently included the losses but not the assets.

■■■ Husband argues that the trial court's valuation should be accepted because there were numerous errors, both legal and factual, in Wife's expert's valuation of Mo. Corp. We do not decide that issue because we do not discern Wife's argument to be that the value selected by the court was against the weight of the evidence. Rather, we interpret the argument to be and agree that the court's valuation of this asset was not supported by competent and substantial evidence. The issue of the valuation of Mo. Corp. will therefore be remanded to the trial court for the receipt of evidence and redetermination of the business' value(s). The trial court retains its discretion to weigh and choose between competing opinions and methods as to valuation. We hold only that where two wholly separate business entities are combined for purposes of losses, they should be consistently treated

10. The operating expenses and depreciation were "available" in the valuation process for use in Mo. Corp.'s value because both parties had agreed to use a net asset value for the Del. Corp. rather than a going concern valuation.

11. Wife's expert also testified that a proper consolidation method would have required adjustments for certain transactions such as intercompany loans, rent paid by Mo. Corp., etc. We believe that, absent definitive evidence that a particular valuation method or adjustment is not an acceptable accounting practice, the use of and value given particular adjustments and methods is a question of fact for the trial court, aided by expert testimony, to determine. *Flarsheim*, 432 S.W.2d at 255. *Miranda*, 596 S.W.2d at 65. Because we re-

verse, we leave these issues open for resolution by the trier of fact based on the value and weight of the evidence presented.

12. There would be some tax consequence by sale of an asset that had tax depreciated more than its economic depreciation. The tax consequence could be either as a capital gain or depreciation recapture. To the extent such a taxable consequence exists, the difference between economic and tax depreciation is reduced.

13. Curiously, Husband's expert was not asked whether any such distinction is appropriate. He, in fact, seemed to have little information concerning whether the airplanes owned by Del. Corp. were appreciating or declining in value.

with regard to income and assets.[14] In other words, the consolidations of financial data should include both "sides" of the balance sheet and income and expense statements.

■ Wife contends in Point II that the trial court's determination of Del. Corp. value was against the weight of the evidence. She complains that the trial court found a net asset value for Husband's interest of $268,580 when the appraisals, exhibits and even Husband's testimony, gave a value of $340,000. The valuation of an asset in a dissolution is a question of fact. *In re K.B.*, 648 S.W.2d at 206. We do not address this issue, however, because of our disposition of Point I. On remand, the trial court may or may not decide to give a separate value to Del. Corp.

## CALCULATION OF CHILD SUPPORT

■ In Point III, Wife attacks the trial court's calculation of child support in several respects. The trial court rejected the Forms 14 submitted by the parties and prepared its own. Wife first complains that the court's findings of fact found the Husband's income to be $12,123.92, but inexplicably used a figure of $10,877.92 on the Form 14. Her second complaint is that husband should not have received the overnight visitation credit because her imputed income was too low. The court's Form 14, however, did not include the $1,000 per month maintenance awarded to Wife, which should have been considered in determining her income. *Directions and Comments*, Form 14. This omission affected both the calculation of the basic

child support amount and the determination whether Husband was entitled to an overnight visitation credit on Line 11 of Form 14. Wife next complains the court erroneously reduced Husband's income by subtracting from it depreciation losses on the couple's farm which was awarded to Wife; she argues this was error because those losses would not affect Husband's income in the future because of the property division awarding the farm to her. Husband concedes these errors and he points out that the trial court erred in also reducing his income by his 401k contributions. Husband contends that with the aid of a new Form 14 submitted to this court we can recalculate the proper support amount and avoid a remand. We do not need to remand where we can correct the calculations based on the findings of the trial court. Rule 84.14. *Trausch–Azar v. Trausch*, 983 S.W.2d 199, 203 (Mo.App. 1998).

■ We, however, find additional fundamental errors in the trial court's calculations which prevents us from calculating the proper support amount. With the recalculations agreed to by Husband, he would have a Form 14 income of $12,693.17 per month, or $152,170.40 annually. Husband had Form 1040 "total income" of $215,414.[15] Through the company accountant, Husband presented, and the court adopted, a calculation based on averaging Husband's income from his tax returns over a period of five years. The income for some of the earliest years was as low as $70,000. These were the years when the business was just getting started. The accountant attempted to reduce the impact

14. The astute reader may note that Del. Corp. was given a separate value (based on a net asset method) by the trial court. If Del. Corp.'s assets were included in Mo. Corp.'s value, there would be no reason to separately value Del. Corp. The reader might wonder whether there would, therefore, be any net difference in the result reached by the trial court. We are unable to calculate from the record that effect and thus must return that question to the trial court.

15. After reduction for a "self employed health insurance cost," his "adjusted gross" income was $213,794. The Directions, Comments for Use in Completion of Form 14, do not indicate directly whether such a reduction is correct. The comment regarding self-employment indicates that gross income is the net profit or loss on the schedules filed as part of the parent's tax returns. A non-self-employed parent would not receive any deduction for the parent's cost of health insurance for him or herself.

of the lower wage years by weighting the average to give more credit to the more recent years. There was no testimony that the 1997 tax year income was an aberration. The substantial increases in Husband's income over those years seems to be roughly parallel to the growth in his various business interests over that time. There was no testimony that Husband had a realistic and reasonable expectation that his income in future years would be less than in 1997.

We are mindful that a past earnings history is indicative of present earning capacity. An award of child support is within the sound discretion of the trial court. *Price v. Price*, 921 S.W.2d 668, 673 (Mo.App.1996). "We will not substitute our judgment for that of the trial court absent a manifest abuse of discretion and will not disturb an award of child support unless the evidence is 'palpably insufficient' to support it." *Holmes v. Holmes*, 878 S.W.2d 906, 909 (Mo.App. 1994). A court may consider past, present and anticipated earning capacity in determining the ability to pay child support. *Effinger v. Effinger*, 913 S.W.2d 909, 914 (Mo.App.1996). However, unlike *In re Marriage of Spence*, 943 S.W.2d 373, 379 (Mo.App.1997), there was no evidence or finding that a high earnings year was not typical or an aberration.

Where averaging of income historically is appropriate, it is not proper where, as here, there is evidence that it does not reflect current earning capacity. Even if averaging were appropriate, the trial court did not follow the *Directions and Comments* for calculating a parent's income in a business such as Husband was involved. The Directions and Comments for Form 14 to Line 1 (page 4) indicate that if a parent receives "rents or royalties or is self-employed, in a sole proprietorship or business with joint ownership, 'gross income' is gross receipts minus the ordinary and necessary expenses incurred

to produce such receipts. *Depreciation, investment tax credits and other non-cash reductions of gross receipts* may be excluded from such ordinary and necessary expenses." (Line 1, page 4) (Emphasis added). *Douglas–Hill v. Hill*, 1 S.W.3d 613, 617 (Mo.App.1999). In the present case, Husband had rental income and partnership income. In addition, because the two corporations had chosen Subchapter S status under Internal Revenue law, they were taxable substantially as is done with a partnership. In that arrangement, no taxes are assessed at the corporate level but rather the income and losses (including depreciation) are passed through to the individual tax returns of the shareholders.[16] Such, in fact, happened here. The parties' tax returns indicate reductions in income for depreciation of farm assets, and § 179 deductions from one of the corporations. More specifically, Husband's calculation of his income was further reduced by depreciation not only of the airplanes but other depreciable assets in which he had an interest through the various formal partnerships. Whether the trial court allows such adjustments is within the court's discretion. *Klockow v. Klockow*, 979 S.W.2d 482, 490 (Mo.App.1998); *In re the Marriage of Chorum*, 959 S.W.2d 900, 905 (Mo. App.1997). There is no indication the trial court considered any of these factors in determining Husband's income and in fact it would appear to the contrary.

Where complicated business and tax status applies, the partnership and Subchapter S income reflected on the individual's tax return may not represent the true amount of cash or benefit that may be available to the parent and therefore, for the support of the child. The importance of this distinction is demonstrated by the first Form 14 *Comment* on page 4: " 'Income' for purposes of computing the presumed child support amount consists of a financial benefit or money received by a parent that could have a positive impact on the parent's ability to support the parent's

---

16. O'Neal, *supra,* at § 2.06.

children." There was no evidence of the actual cash available to Husband for the payment of child support. Where there are complex business interests such as here, the court must at least consider the issues raised by *Directions and Comments,* Form 14. Except for the averaging, the court appeared to make the child support calculation in a manner more properly suited for a salaried or hourly employee. The point is sustained.

## ATTORNEY'S FEES

Wife asserts in Point IV that the trial court erred in refusing to order Husband to pay her attorney's fees and expenses. As a general rule, the parties to a dissolution are to pay their own attorney's fees. *Rich v. Rich,* 871 S.W.2d 618, 627 (Mo.App.1994). RSMo. § 452.355.1 permits, but does not require, a trial court to award attorney's fees. Two factors for consideration under RSMo. § 452.355.1 are the actions of the parties during the pendency of the action, and the parties' financial situation. The court has broad discretion in ordering or refusing to order attorney fees, and its ruling will be disturbed on appeal only upon a showing of abuse of discretion. *Cohn v. Cohn,* 841 S.W.2d 782, 787 (Mo.App.1992).

To show an abuse of discretion by the trial court, the complaining party has the burden to show that the order for attorney's fees is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and to indicate a lack of deliberation." *Ederle v. Ederle,* 741 S.W.2d 883, 885 (Mo.App.1987).

Wife argues that she is entitled to attorney's fees because the trial court erroneously found that her actions delayed the proceedings and caused additional costs to be incurred, and that she had substantial assets with which to pay her attorney's fees.

With regard to the court's finding that Wife's change in counsel delayed proceedings, the record demonstrates that the proceedings were indeed delayed at least once at Wife's request. This was because her expert witness required additional time to revise his opinion. The court specifically found that the disposition of this case had been in part delayed by her actions, by changing her attorney, and consequent need to obtain a second appraisal of Husband's business interests.

Furthermore, with regard to whether Wife had substantial assets with which to pay her attorney's fees, the parties' financial situation is only one of other relevant factors the trial court must consider in determining whether an attorney's fee award is justified; it is not a controlling factor. *Cohn,* 841 S.W.2d at 787. Given the court's disposition regarding the property division, we cannot say that Wife needlessly obtained a second valuation expert and should therefore be denied attorney's fees for that reason. Because of our disposition herein, we also remand the question of attorney's fees to the trial court for consideration after completion of the evidence of all of the factors set forth in § 542.355.1.

## UNEQUAL DISTRIBUTION OF PROPERTY

In her fifth point, Wife contends the court erred in its award to Husband of 60 percent of marital assets. The court found that Wife was guilty of marital misconduct and awarded marital property disproportionately in a 60/40 split in favor of Husband.

Wife contends that she did not begin her affair until after Husband began his relationship. In essence, she asks us to reverse the trial court's apparent credibility determination in favor of Husband. The trial court has broad discretion in dividing martial property, *In re Marriage of Pew,* 780 S.W.2d 687 (Mo.App.1989); the division must be done fairly but not necessarily equally. *Carter v. Carter,* 940 S.W.2d 12, 16 (Mo.App.1997). The division will

only be disturbed when it is so "heavily and duly weighted in favor of one party as to amount to an abuse of discretion." *Allen v. Allen*, 961 S.W.2d 891, 893 (Mo.App. 1998). We have approved distributions more unequal than the one herein. *Earle v. Earle*, 901 S.W.2d 140, 142 (Mo.App. 1995). Wife does not contend that the degree of unequal distribution constituted an abuse of discretion but instead challenges the sufficiency and weight of the evidence to support the finding of her misconduct as a basis for the disproportionate division. The trial court is in a superior position to judge the credibility of witnesses. Unless the judgment lacks substantial evidence to support it, or is against the clear weight of the evidence, we will sustain the trial court's finding. *Pederson v. Pederson*, 599 S.W.2d 51 (Mo.App.1980). The court's findings of misconduct are supported by the evidence. We make no specific finding approving or disapproving of the amount of the disparity in the division. Because there are a number of factors, including misconduct, that are relevant to the division and because the court must re-value several substantial assets, its new judgment after remand may or may not have exactly the same percentage division.

The division of marital property lies within the sound discretion of the trial court and we will disturb the trial court's division of the property only where it is improper, or where an abuse of discretion is shown. *Dardick v. Dardick*, 670 S.W.2d 865, 868 (Mo. banc 1984). Having reviewed the evidence, the trial court's decision is supported and there has been no abuse of discretion. Point V, therefore, is denied.

### OTHER PROPERTY

Wife complains in her last point that the court erred in either including or omitting certain personal property from its distribution. Husband concedes virtually all of these matters. They can be corrected on remand and, therefore, no additional discussion is needed.

For the reasons stated, the cause is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. On remand the trial court should reconsider the valuation of the business as indicated herein. The trial court shall also reconsider the proper amount of child support and the issue of attorney fees consistent with this opinion and correct the technical errors in omission or inclusion of certain personal property that are conceded by the parties. In all other respects, the judgment is affirmed.

EDWIN H. SMITH, Presiding Judge, and VICTOR C. HOWARD, Judge, concur.