**Glen HADEN, Appellant,**

v.

**Cathy Lynn (Haden) RIOU, Respondent.**

**No. WD 58199.**

Missouri Court of Appeals, Western District.

Feb. 20, 2001.

Allen S. Russell, Kansas City, for appellant.

Gabriel A. Domjan, Independence, for respondent.

Before SMART, P.J., ELLIS and LAURA DENVIR STITH, JJ.

ELLIS, Judge.

Glen J. Haden (Father) and Cathy Lynn Riou (Mother) were married on May 15, 1980. The Circuit Court of Jackson County dissolved the marriage on August 10, 1994. Three children were born of the marriage, Logan Haden, born January 1, 1984, Seth Haden, born October 24, 1985, and Lacy Haden, born September 30, 1987. Pursuant to the dissolution decree, the parties were awarded joint legal custody, and Mother was awarded primary physical custody of the parties' three minor children. Father was ordered to pay $582 per month for support of his three children, retroactive to August 1, 1994. Father was awarded visitation with the children on alternate weekends, certain holidays, Father's Day, and four weeks in the summer. Father was ordered to pay fifty percent of any health care costs for the children that were not covered by insurance.

On February 23, 1998, Father filed a motion to modify child support, child custody, and visitation. He alleged there were substantial and continuing changed circumstances since the entry of the decree of dissolution and that modification of the decree was in the best interests of the children. The motion alleged changed circumstances in that the children had grown older and expressed a desire to spend more time with their father; the children spent approximately half of their time with the father; and the parties shared expenses for the children. The motion further asserted that Father had paid many of the children's expenses, including school, clothing, extra-curricular, and medical, and these expenses should be credited against his child support obligation. Father asked for joint physical custody or

that he be named the primary physical custodian. In the alternative to primary physical custody being awarded to Father, he also asked that his child support obligation be reduced or eliminated.

On April 3, 1998, Mother filed an answer and cross-motion to modify the dissolution decree as to child support. She asked for an increase in child support because the following had occurred since the dissolution decree was entered: the children's expenses had increased, Father's income had increased, the cost of maintaining the children's standard of living had increased, Logan Haden had incurred extraordinary medical expenses and Mother needed assistance from Father to pay those expenses, and Father's obligation to support had increased by 20% pursuant to the child support guidelines in effect at the time modification was requested.

A hearing was held on the motions to modify on June 14, 1999, and the following evidence was adduced. The couple never followed the visitation plan outlined in the dissolution decree. Instead, during the school year, Seth and Lacy's visitation with Father consisted of spending every other weekend with him plus Monday night and Thursday night. Since Father moved to Lee's Summit, approximately a mile from Mother's home, the parties have deviated from their own arrangement and Seth and Lacy were generally allowed to stay wherever they wanted to on any given night, except the alternating weekend visitation was always adhered to. The two youngest children often went back and forth between the two houses during the day and after school. Father exercised his right to have the children for continuous time during the summer only once, and that was for a week of vacation. Logan, the oldest child, chose to spend only alternating weekends with Father because he did not want to disrupt his schedule with changing households throughout the week.

Father continued to pay $582 per month in child support for his three children until

he lost his job on February 15, 1999. At the time of the hearing, Father was three months behind in child support payments. Mother knew Father was going to lose his job approximately six months before he was fired because Father worked for Mother's brother-in-law at Kenny's Floor & Tile. Mother did not tell Father about the impending release from his job, so he was unable to find other employment prior to being fired. Father was receiving $187 per week in unemployment benefits and he started his own business of repairing whirlpool tubs on May 1, 1999. Father took out a loan for $5,000 to start his business and he received approximately $6,000 in gross income from his business between May 1, 1999, and the date of the hearing, June 14, 1999. Father was remarried and his wife's income equaled $40,000 per year.

Father presented exhibits detailing what he claimed were his expenses for the children in 1998. The expenses included the amount of child support he paid, $582 per month, a portion of his mortgage payment, utility payments, grocery bills, vacation costs, automobile expenditures and the like, and totaled $30,348.06. Father introduced a similar exhibit covering the period from January 1, 1999, to June 14, 1999, the date of the hearing, which reflected a total of $12,442.59. Mother disputed most of the expenditures Father listed. But the record is effectively devoid of any evidence regarding Mother's expenses for the children.

The Court entered a judgment modifying the dissolution decree finding that a substantial and continuing change of circumstances had occurred with regard to the Mother and the children, requiring a modification in child support and the par-

enting plan. The Court found the parents had voluntarily deviated from the Court's original order of physical custody. The Court prepared its own parenting plan for the parties to follow. The parents were awarded joint legal and physical custody of the three children, with their primary residence to be in Mother's home. According to the visitation schedule set up by the Court, the children were to reside with Mother during the week and Father was granted visitation on alternating weekends and Tuesday evenings. During the summer, from June 15 to August 15 of each year, the children were to reside with Father, and Mother would be allowed visitation on alternate weekends. Father was awarded uninterrupted parenting time in even numbered years from June 30 to July 14 and in odd numbered years from July 25 to August 8. Mother was granted uninterrupted parenting time in odd numbered years from June 30 to July 14 and in even numbered years from July 25 to August 8. The Court also made a holiday schedule basically alternating holidays between Mother and Father with the exception of Mother's Day and Father's Day, which would be spent with the respective parent every year.

The Court found Father was unemployed due to no fault of his own; however, for purposes of child support, the Court imputed $4,000 per month in income to the Father. Father and Mother each filed a Form 14 calculation of presumed child support with the court, but the Court rejected both of their calculations.[1] The Court prepared its own Form 14 calculation for child support, finding the correct presumed child support amount to be $786.00 per month for three children, $678.00 per month for two children, and

---

1. The trial court stated that it was "rebutting" the Form 14's when in actuality it "rejected" them. "A trial court 'rejects' a Form 14 calculation when it finds that the calculation itself was incorrectly done, i.e., when an item is incorrectly included in the calculation, an amount of an item included in the calculation is incorrect or the mathematical calculation is incorrect. A trial court 'rebuts' the presumed correct child support amount, as calculated pursuant to a correct Form 14 calculation, when it determines that the amount calculated is unjust or inappropriate after considering all relevant factors, including non-Form 14 factors." *Peery v. Peery*, 933 S.W.2d 912, 915 (Mo.App. W.D.1996) (Citations omitted).

$487.00 per month for one child.[2] The court found its calculations to be unjust and inappropriate; thus, it rebutted its own Form 14 presumed child support calculations. The Court found the actual expenses for supporting the minor children totaled $30,348.06 per year, relying exclusively on Father's exhibits reflecting only Father's estimated expenditures for 1998. Using that figure, the Court found Father's child support obligation, before adjusting for overnights, to be $1,687.00. The Court determined that Father would have the children 37 percent of the time under its parenting plan; thus, Father's child support obligation totaled $1,063.00 per month ($1,687.00 × 63%) for three children. The Court ordered this child support obligation to be effective retroactively to June 1, 1999, and awarded Mother retroactive child support in the amount of $3,367.00.[3] The Court then went on to set future child support amounts based on emancipation of one child at $907.00 per month for two children, and upon emancipation of two children at $631.00 per month for one child.

The Court also ordered Father to pay for 70% of each child's post-secondary school expenses. Mother was allowed the right to claim the tax dependency exemption for all three children beginning in 1999.[4] Father was ordered to pay Mother $1,000.00 for her attorney's fees. Father appeals.

Father presents three points on his appeal. First, he contends the trial court erred in imputing income to him and thereby increasing his child support obligation. Second, he claims the trial court erred in finding his and Mother's Form 14 child support calculations "unjust and inappropriate" and the Court's calculation of "actual expenses" was against the weight of the evidence. Finally, Father contends the trial court erred in entering its own parenting plan, thereby disregarding the agreement of the parties.

An appellate court will not disturb an order modifying child support obligations unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Mudd v. Mudd*, 859 S.W.2d 699, 700 (Mo.App. E.D.1993). We will set aside a judgment on the basis that it is against the weight of the evidence only with caution and with a firm belief that the trial court judgment is wrong. *Morton v. Myers*, 21 S.W.3d 99, 104 (Mo. App. W.D.2000) (*quoting Harris v. Harris*, 803 S.W.2d 167, 169 (Mo.App. S.D.1991)). "We afford the trial court deference with regard to its determinations of credibility and view the evidence in the light most favorable to its decision." *Id.*

"An award of child support is within the sound discretion of the trial court." *Thill v. Thill*, 26 S.W.3d 199, 207 (Mo.App. W.D.2000). " 'We will not substitute our judgment for that of the trial court absent a manifest abuse of discretion and will not disturb an award of child support unless the evidence is 'palpably insufficient' to support it.' " *Id.* (*quoting Holmes v. Holmes*, 878 S.W.2d 906, 909 (Mo.App. E.D.1994)).

In his first point on appeal, Father contends the trial court erred in imputing

---

**2.** In addition to calculating the presumed child support amount for three children, the Court calculated the presumed amount for two children, considering one child will be emancipated in the future, and then again for one child, when two children are emancipated.

**3.** The trial court entered its judgment on January 3, 2000. The total child support owed from June 1, 1999, to December 31, 1999, was $7,441.00 ($1,063 × 7). The previous child support amount that continued in effect until the judgment was entered was $582 per month, and the total accruing between June 1, 1999, and December 31, 1999, was $4,074 ($582 × 7). The difference between $7,441 and $4,074 is $3,367.

**4.** Prior to modification, Father claimed Seth and Logan as dependents and Mother claimed Lacy.

$4,000 of income to him, thereby increasing his child support obligation. In its judgment, the Court found the following regarding Father's employment and income. Father was terminated from his employment with Kenny Floor & Tile, on February 15, 1999, due to no fault of his own. Father started his own whirlpool and spa tub repair business on May 1, 1999, and anticipated it would be profitable in October 1999. Father's new spouse earned $40,000 income annually and Father was continuing to collect unemployment benefits in the amount of $187.00 per week. Despite the income generated in Father's home and Father's receipt of unemployment benefits, Father failed to pay child support for three months preceding the hearing. The court then entered the following regarding the imputation of income to Father:

> Father has the ability to earn $4,000.00 per month repairing Whirlpool and other spa tubs. Father earns 66.7% of the income earned by the parties. The Court therefore imputes income to the Father [for] purposes of calculating child support in the amount of $4,000.00 per month.

"A parent is not permitted to escape responsibility to his or her family by deliberately limiting his or her work to reduce income." *Davis v. Department of Social Services, Division of Child Support Enforcement*, 21 S.W.3d 140, 141 (Mo.App. W.D.2000). "In order to avoid such a situation, income may be imputed to a parent based on what that parent could earn by the use of his or her best efforts." *Id.* "If a parent is unemployed or determined to be underemployed, 'gross income' may be based on imputed income." *Civil Procedure Form No. 14, Directions, Comments for Use and Examples for Completion of Form No. 14, Line 1: Gross Income.* The Form 14 comment regarding imputed income provides:

> When determining whether to include imputed income and, if so, the amount to include in a parent's "gross income," a

court or administrative agency shall consider all relevant factors, including:

(1) the parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;

(2) the parent's occupational qualifications;

(3) the parent's employment potential;

(4) the available job opportunities in the community; and

(5) whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

*Id.* at *Comment H.* While the imputation of income is proper in certain situations, some limitations exist:

> Although a court is permitted to impute the income to a parent that he or she earned in the past, an award of child support must always be supported by evidence of the parent's ability to pay. *Walker v. Walker*, 936 S.W.2d 244, 248 (Mo.App.1996). "Proof that a parent has previously made more money ... is not alone a sufficient basis upon which to impute income at those levels," as the amount imputed must be based on the types of evidence discussed in the Form 14 instructions. *Id.*

*State ex rel. Atkinson v. Anthony*, 947 S.W.2d 832, 835 (Mo.App. W.D.1997).

From the record, it appears that Father's average monthly income for the three years prior to his termination by Kenny's Floor & Tile was $4,055. During the three months after his termination and before he started his own business, he only received $187.00 per week in unemployment compensation.

Father opened his new business in May 1999, just over a month before trial. He presented evidence of his gross receipts and business expenses for the

month of May 1999, primarily in the form of his Exhibit 10, which was admitted into evidence. This exhibit sets Father's gross receipts at $6,000 for the month of May and his necessary and ordinary business expenses for that same month at $3,528.63. Thus, if the trial court believed all of the information in Exhibit 10, Father had earned $2,471.37 in net income during the month of May. We note, however, that the trial court is free to disbelieve the testimony of any witness. *Webb v. Fox*, 978 S.W.2d 16, 22 (Mo.App. W.D.1998). We give great deference to the trial court's ability to draw conclusions, and to weigh the credibility of the witnesses, their sincerity, and character. *Id.* And here, the trial court expressly stated that it had accepted some of the witnesses' testimony as credible but rejected other parts of their testimony as not credible.

Father prepared Exhibit 10 the morning of trial, before the hearing began. The information contained in Exhibit 10 was derived from Father's memory. He did not have receipts before him or any type of documentation to support the figures provided in Exhibit 10. When asked if he had been paid for all of the jobs he completed in May, Father responded with, "Not very many of them." Father testified that he bills the builder for the job, and it usually takes between 30 and 60 days to get his money. Based on this testimony, the trial court could have reasonably inferred that his gross *income* for the month of May was substantially greater than the $6,000 in payments he had actually received during the month.

Moreover, in calculating gross income of a self-employed parent, for purposes of a Form 14 child support calculation, the court deducts only those "ordinary and necessary expenses" incurred to produce the receipts received during that particular month. *Civil Procedure Form 14, Directions, Comments for Use and Examples for Completion of Form No. 14, Line 1: Gross Income.*

Since Father performed work in May for which he had not been paid, it is likewise reasonable to infer that part of the expenses he incurred in May were attributable to jobs for which he had not yet been paid.

Accordingly, the trial court could have reasonably believed that Father's gross monthly income from his business was somewhat greater than the $6,000 in receipts to which Father testified, and that his expenses were somewhat less than the $3,528.63 he reflected. Based on Father's employment history, the short time in which it took him to start his business, and the even shorter time in which it took him to start generating substantial income, the trial court could have reasonably concluded that Father had substantial occupational qualifications, good employment potential, and that a need existed in the community for his services, all factors required to be considered by Form 14. This evidence, conjoined with the fact that his average monthly income for the previous three years was $4,055, is sufficient to support the trial court's decision to impute $4,000 per month income to Father. While we might have reached a different conclusion, we cannot say the trial court abused its discretion. Point denied.

In his second point on appeal, Father contends the trial court erred in finding the parties' child support calculations and its own child support calculations to be unjust and inappropriate. More specifically, Father argues the trial court erred in finding that $30,348.06 was the actual cost of supporting the three children, and that Mother failed to carry her burden of rebutting the presumed correct child support amount.

In determining child support, the trial court is required by § 452.340.7[5] and Rule 88.01 to follow a two-step procedure. *Nelson v. Nelson*, 25 S.W.3d 511, 520 (Mo.App. W.D.2000). First, the court

**5.** All statutory references are to R.S.Mo Cum.    Supp. (1998) unless otherwise indicated.

must determine the presumed child support amount by correctly completing a Form 14 calculation. *Id.* The trial court is free to accept the presumed child support amount calculated pursuant to Form 14 by one of the parties, or it can reject the calculations of both of the parties and complete its own Form 14 calculation. *Id.* at 521. Second, the trial court must determine if the presumed child support amount calculated, on the Form 14 adopted by the court, should be rebutted as being unjust and inappropriate. *Id.* at 520.

In accordance with the two-step procedure outlined above, the record reflects that the trial court considered the Form 14 calculations submitted by the parties, and although expressing its judgment in terms of "rebuttal," actually "rejected" both Form 14's submitted by the parties as incorrect. Presumably the trial court rejected them because they listed a different amount of income for Father than the amount the trial court imputed to him.[6] The Court proceeded to properly calculate its own Form 14, using the $4,000 per month income it imputed to Father. It then rebutted that amount as being unjust and inappropriate "[a]fter consideration of all relevant factors pursuant to Section 452.340.8 and Rule 88.01 . . . ." In doing so, the court made the following finding:

> Based upon the actual expenses of the children, as proven by Petitioner's evidence that the actual costs of supporting the minor children is $30,348.06 per year, Petitioner's support obligation, before adjusting for overnights, is $1,687.00 per month. Petitioner has the children 37% of the time under the Court's Parenting Plan, which results in the Petitioner having a child support obligation of $1,063.00 per month for the three (3) children.[7]

Father argues that the trial court erred in finding that $30,348.06 was the actual cost of supporting the minor children and that Mother failed to carry her burden to show a need for deviating from the Form 14 presumed correct child support amount. We agree.

In his motion to modify, Father was seeking custody of the children or alternatively, a reduction in child support. As part of his case, Father prepared Exhibit 7, which was a spread sheet reflecting actual and estimated expenditures he made in 1998 in support of the children. The total amount reflected in the exhibit was $30,348.06. This amount included the $584 per month he paid to Mother for child support. But it also included estimations that he contended were attributable to the children. For instance, he treated the children as having lived with him all year, thereby resulting in a household of five people, himself and his spouse, and the three children. Accordingly, he included 60% of family food costs ($4,698.38), clothing and shoes ($2,981.40), mortgage payments ($6,661.60), utilities ($1,886.76), and personal care ($1,144.56). He also included numerous other estimated amounts for a variety of categories. In any event, the exhibit reflected the amounts that Father estimated he spent on behalf of the children during the year 1998. And for purposes of trying to demonstrate what his costs of supporting the children would be if he were the custodial parent, the exhibit would have been helpful.

But since the children did not live with Father all year, the amounts listed by Father were incorrect on their face, even if the court was willing to accept the manner in which they were calculated. More importantly, the exhibit did not include any actual or estimated amounts expended by

---

6. We do not have in the record the Form 14 calculations submitted by the parties, therefore, we cannot determine on what basis the trial court found those calculations to be incorrect.

7. The trial court's determination of Father's child support obligation was derived by dividing $30,348.06 by 12 months, which results in a figure of $2,529, and then multiplying that number by 66.7%, Father's percentage of the total parental income, yielding $1,687.

Mother, who, of course, was the custodial parent. For these reasons, the trial court erred in finding that the amount in Exhibit 7 was the actual cost of supporting the minor children.

■ Rule 88.01 creates a rebuttable presumption that the Form 14 amount is the correct amount of child support. *Crews v. Crews*, 949 S.W.2d 659, 669 (Mo. App. W.D.1997). The burden is on the party seeking to rebut the Form 14 amount to show a need for deviating from that amount. *Id.* And, even when it is not clear that a party sought to rebut the Form 14 amount, the party benefiting from an upward deviation has the burden to demonstrate in the record the need for the trial court's deviation from the presumed correct child support amount. *Id.* Mother failed to carry her burden in the trial court and she likewise fails here by virtue of her inability to direct us to evidence in the record that would support the trial court's deviation from the Form 14 child support amount.

Mother presented virtually no evidence regarding her actual costs for support of the children. She did not controvert the Rule 88.01 presumption. Rather, she relied on the Form 14 calculations. Moreover, from our independent review of the record, there is insufficient evidence to support the trial court's deviation from its Form 14 presumed correct child support amount. While some of the evidence Father presented as to the costs of food, clothing and shoes, and personal care might have some relevance in establishing those costs even when the children are in Mother's custody, other expenses such as mortgage payments and utility costs simply do not apply. Based on the entire record, the evidence is insufficient to support the trial court's award of child support. *Elliott v. Elliott*, 920 S.W.2d 570, 574 (Mo.App. W.D.1996). Accordingly, we reverse that portion of the trial court's judgment relating to child support, and remand to the court with directions to enter a child support award consistent with the Form 14 presumed child support amount. *Surface v. Surface*, 10 S.W.3d 216, 219–20 (Mo.App. W.D.2000).

■ In his third point on appeal, Father contends (1) that the trial court erred in entering its own parenting plan and disregarding the stipulation of the parties as to custody and visitation, (2) that the Court's parenting plan was not in the best interest of the children, and (3) that the Court failed to make sufficient written findings in accordance with § 452.375.6.

■ "Greater deference is given to the determination of the trial court in child custody matters than in other cases." *Brown v. Brown*, 19 S.W.3d 717, 720 (Mo. App. W.D.2000). "In custody cases an appellate court should exercise its power to set aside the trial court's judgment or decree on the ground that it is against the weight of the evidence only with caution and with a firm belief that the decree is wrong, and only if it is firmly convinced that the welfare of the child[ren] requires another disposition." *Id.*

Father argues that the following exchange, which occurred just prior to trial, between the Court and the attorneys reflects a stipulation by the parties as to custody and visitation:

Mr. Russell (Father's attorney): Also, we have reached an agreement on the part of the matter involving the children in terms of their custody. They will be in joint physical, joint legal custody of both parties.

Mr. Domjan (Mother's attorney): I think we have reached an agreement on as far as for the visitation schedule, Judge.

The Court: You can reach physical parenting time but not the shared decision making?

Mr. Domjan: Regarding that, sure.

The Court: Have you regarding that.

Mr. Russell: The present order says she has primary custody. They are agreeing to a 50/50 schedule.

Mr. Domjan: There is a dispute as to whether that is 50/50 or not.

The Court: Have you agreed on the days? That is my question. I guess I can determine if that's 50/50 by counting them.

Mr. Domjan: That's correct.

The Court: All right. So the issue of time is agreed to. Now, when the last judgment was entered was there a parenting plan?

Mr. Domjan: No, Your Honor. That was back in 1994.

The Court: There has to be one. So have they agreed on the terms of a parenting plan?

Mr. Domjan: No, Your Honor.

The Court: As far as shared decision making and that type of thing?

Mr. Domjan: No, Your Honor. At the last time there was a joint legal custody as far as Mr. Russell stated. That's not being changed.

The Court: The mere statement of joint custody can take a variety of forms, and there has to be a parenting plan. I take it neither party is prepared to present one?

Mr. Russell: That's correct. I think we can probably hammer one out between the two of us on those issues right here.

The Court: Okay. So what is it you expect the Court to try?

Mr. Russell: The issue of support primarily.

Contrary to Father's assertion, we are unwilling to say that this exchange apprised the court of a stipulation by the parties as to custody and visitation. Indeed, it can't even be said with certainty that it represented an agreement to a visitation schedule on a 50/50 basis. There was no indication the parties agreed to custody arrangements and neither party

submitted a parenting plan outlining their agreement or responsibilities.[8]

▆▆▆▆ A custody order must reflect that the arrangement is in the best interests of the children, § 452.375.2, even when the parents stipulate to the outcome. *Tompkins v. Baker*, 997 S.W.2d 84, 91 (Mo.App. W.D.1999). The fact that the parents stipulated to a custody arrangement is one factor the trial court considers when determining the best interests of the children. § 452.375.2(1); *Tompkins*, 997 S.W.2d at 91. Mother and Father were required to present evidence of the propriety of their stipulation and whether the custody arrangement in the stipulation serves the children's best interests and future welfare. *Tompkins*, 997 S.W.2d at 91. "A trial judge's responsibility for determining what is in the best interests of the child[ren] mandates that the judge act upon the evidence presented." *Id.*

▆▆▆ After hearing all the evidence, the trial court made the following statements to the parties regarding its need to create a parenting plan: "It seems apparent to the Court that since these people have talked together one time in the last year and a half that some sort of parenting plan with orders from me to compel them to act are necessary." The Court then stated that the parents were not working together to see that the children were visiting freely between the two homes, but instead, the children were running wild because there's no communication between the parents. Thus, it is evident from the record that the Court found that if there was an "agreement" between the parents, it was not in the best interests of the children. A trial court is not bound by an agreement between the parents as to custody and visitation; such an agreement of the parties is only one factor to be considered by the trial court. § 452.375.2(1); *Tompkins*, 997 S.W.2d at 91.

8. Father filed his motion to modify prior to the enactment of § 452.310.7, which requires the parties to submit proposed parenting plans to the Court with their motion to modify.

Father next argues that the trial court erred in not following the statutory directives of § 452.375.6, which states as follows:

> If the parties have not agreed to a custodial arrangement, or the court determines such arrangement is not in the best interest of the child, the court shall include a written finding in the judgment or order based on the public policy in subsection 4 of this section and each of the factors listed in subdivisions (1) to (8) of subsection 2 of this section detailing the specific relevant factors that made a particular arrangement in the best interest of the child. If a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment or order detailing the specific relevant factors resulting in the rejection of such arrangement.

When interpreting a statute, we look to the intent of the legislature and try to give effect to that intent when possible. *Brandow v. Brandow*, 18 S.W.3d 584, 587 (Mo. App. W.D.2000). We do so by looking at the language used in the statute, and giving the words used their plain and ordi-

nary meaning. *Id.* In *Brandow*, we explained the plain and ordinary meaning of § 452.375.6 as follows:

> According to the plain language of the statute, when the parties have not agreed to a custodial arrangement, the court is required to include in its judgment a written finding based on the public policy on § 452.375.4 [9] and the factors listed in § 452.375.2(1) to (8),[10] detailing the specific relevant factors that made the chosen arrangement in the best interest of the child. Furthermore, the statute requires that if a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment detailing the specific relevant factors resulting in the rejection of the arrangement.

*Id.* at 587–88. The record reflects that Mother and Father had not agreed on a custody arrangement for the children. Pursuant to the language of the statute, the trial court was required to make a written finding, *in its judgment,* detailing the "specific relevant factors" that caused

**9.** The text of § 452.375.4 states in pertinent part as follows:

> The general assembly finds and declares that it is the public policy of this state that frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage is in the best interest of the child...and that it is the public policy of this state to encourage parents to participate in decisions affecting the health, education and welfare of their children, and to resolve disputes involving their children, amicably through alternative dispute resolution. In order to effectuate these policies, the court shall determine the custody arrangement which will best assure both parents participate in such decisions and have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child.

**10.** Section 452.375.2(1)–(8) provides in pertinent part as follows:

> The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved....

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

the Court to believe that this arrangement was in the best interest of the children.

In its judgment, the Court stated "[a]fter giving due consideration to all relevant factors, including those set forth in the "Joint Custody" provisions of · Section 452.375 R.S.Mo., it is in the best interest of [the three minor children], that the parents have joint legal custody of the children." The Court specifically stated it was adopting a parenting plan that will establish a method for sharing information and communication between the parties, which is necessary to serve the best interests of the minor children. It continued by stating that the parenting plan must allow the minor children to participate in a wide variety of activities, it must not be selected in such a way as to exclude either parent from meaningful participation in the minor children's lives, and it must provide the children with consistency in their living arrangements. As to physical custody, the Court said the existing physical custody arrangement needed "to be modified to address the realities of the relationship between Respondent and the child, and to ensure, to the degree possible, that Respondent does have frequent and meaningful contact with the child. The contact between Respondent and the children will have to take into account the age, activities and social functions of the children."[11] The Court then found it to be in the best interest of the children that joint custody be established as set forth in its parenting plan.

It is apparent from the foregoing that the trial court referred in general ways to the factors set forth in § 452.375.2(1) to (8). But it did not include a written finding based on the public policy set forth in § 452.375.4, nor did it make findings as to each of the factors listed in § 452.375.2(1) to (8) detailing the specific relevant factors that made the particular arrangement in the best interest of the children.

The trial court's judgment is reversed and remanded (a) with respect to its award of child support, including its award of retroactive child support, and is remanded with directions to enter a child support award, including any retroactive amounts, consistent with the Form 14 presumed child support calculation; and (b) to make written findings in compliance with § 452.375.6. The trial court's judgment is affirmed in all other respects.

All concur.

---

**11.** It appears that the trial court incorrectly referred to Respondent (Mother) when it intended to refer to Petitioner (Father). Moreover, the Court refers to "child" when it should have used the term "children."