**Francis E. SHERMAN, Appellant,**

v.

**Janet Ann SHERMAN, Respondent.**

**No. WD 61208.**

Missouri Court of Appeals, Western District.

Nov. 9, 2004.

Rehearing Denied Dec. 21, 2004.

---

Joe Don Butcher, Blue Springs, MO, for Appellant.

Jim R. Petrie, Raytown, MO, for Respondent.

Before: BRECKENRIDGE, P.J., and EDWIN H. SMITH and HOWARD, JJ.

VICTOR C. HOWARD, Judge.

Francis E. Sherman (Husband) appeals the judgment of the Circuit Court of Jackson County dissolving his marriage to the respondent, Janet A. Sherman (Wife), with respect to the court's award of child support and division of property.

Husband raises three points on appeal. In Point I, he claims that the trial court erred in awarding Wife child support, as calculated pursuant to the court's Form 14 worksheets, based, in part, on imputing gross monthly income to Husband of $1,000 for earnings from the family business, FNJ Maintenance Company (FNJ),

because the imputation of income to Husband was not supported by substantial evidence. In Point II, Husband claims that the trial court erred in rebutting its presumed child support amounts (PCSAs) as being unjust and inappropriate for not being "sufficient to cover the reasonable needs of the children" and ordering him to pay $1,500 per month in child support because in doing so, the court failed to consider all relevant factors, as required by Rule 88.01.[1] In Point III, he claims that:

> The trial court erred in the division of marital property because case law and § 452.330, R.S.Mo., 1998, holds that if the division of marital property is not fair it is an abuse of discretion such as in this case where the division is so heavily weighted in favor of respondent that it amounts to an abuse of discretion.

We affirm the trial court's judgment in all respects except its award of child support, which, as explained below, is reversed and remanded for further consideration.

## Facts

The parties were married on April 28, 1983, in Kansas City, Jackson County, Missouri. Two children were born of the marriage: Nicole Sherman, born on May 20, 1984; and Alicia Sherman, born on August 4, 1987. Husband filed a petition for dissolution of marriage in the Circuit Court of Jackson County on August 21, 2000. Wife filed an answer and counter-petition for legal separation on October 10, 2000. The petition and counter-petition were taken up and heard by the trial court on November 9 and December 7, 2001.

During the marriage, Husband was employed by Carondelet Health Center and its predecessors (Carondelet). At the time of trial his annual gross income was $76,646.38. Wife was also employed at Carondelet during the marriage as a labor and delivery room nurse. However, after being diagnosed with multiple sclerosis in April of 1997, she was forced to resign in September of that same year. At the time of trial, as a result of her condition, she was receiving Social Security disability benefits of $940 per month and social security benefits for the children of $480 per month.

During the marriage, the parties started a family business, FNJ, which provided contract maintenance services for businesses. There was considerable testimony at trial concerning the amount of income, if any, that was still being generated by FNJ. Husband testified that, although FNJ had been profitable in the past, it was no longer a viable concern, having lost its last maintenance contract. Wife contended that Husband, using his best efforts, was capable of earning income from FNJ of $769 per month and requested that the court impute this amount.

The trial court entered its judgment of dissolution on February 22, 2002, dissolving the parties' marriage and awarding them joint legal and physical custody of the children. The trial court ordered Husband to pay Wife $1,500 per month in child support. In addition, Husband was ordered to pay 78% of all medical and dental expenses not reimbursed by insurance; to tithe a sufficient amount to cover Alicia's tuition expense at St. Thomas More Grade School; and to pay 78% of all costs, including tuition, associated with Nicole's attend-

1. This case was initially submitted and assigned to Judge Smith on July 29, 2003. It was reassigned to Judge Howard on December 15, 2003, who circulated the majority opinion on July 30, 2004. All rule references are to the Missouri Rules of Civil Procedure (2003), unless otherwise indicated.

ing Notre Dame de Sion High School. In dividing the parties' property and debts, the trial court awarded Husband the condominium located in Marco Island, Florida, with the stipulation that it be sold and the first $150,000 in proceeds be paid to Wife. In its judgment, the trial court also awarded Wife $935 in monthly maintenance. With respect to its maintenance award, the trial court ordered that it was to continue until the $150,000 in condominium sale proceeds were paid, at which time the maintenance would automatically decrease to $185 per month.

With respect to child support, both parties submitted Form 14 worksheets as required, which the trial court rejected. The court prepared two Form 14s, using different maintenance credits for Husband, $935 and $185, based on the automatic reduction in maintenance that was ordered. In its Form 14s, the trial court imputed $1,000 in gross monthly income to Husband, which it found he was capable of earning from FNJ, which was awarded to him as marital property. Using the $935 maintenance credit, the trial court calculated the PCSA as being $1,003 per month, and using the $185 maintenance credit, it calculated the PCSA as being $1,102. The court then rebutted both amounts as being unjust and inappropriate, finding the correct amount of child support to be $1,500 per month.

This appeal follows.

### Point I

■ In Point I, Husband claims that the trial court erred in awarding Wife child support, as calculated pursuant to the court's own Form 14 worksheets, based, in part, on imputed gross monthly income to Husband of $1,000 for earnings from the family business, FNJ, because the imputation of income was not supported by substantial evidence. Specifically, he claims that the record did not support the impu-

tation of income to him in that there was insufficient evidence from which the court could find that FNJ was, at the time of the hearing, a viable and profitable business from which Husband, exercising his best efforts, was capable of realizing income of, at least, $1,000 per month.

In calculating the PCSA, the trial court was required to determine each party's gross monthly income. In that regard, the trial court found that Husband's gross monthly income was $7,615 in both of its Form 14 worksheets, including $1,000 for the income the court found he was capable of earning from FNJ. However, as noted in the facts, Husband testified at trial that FNJ was defunct and had no income. He testified further that the company's sole remaining service contract had been terminated as of June 30, 2001; that he had not sought any other contracts; and that he had no intention of continuing the business in that it was no longer viable as a profitable enterprise due to increased labor costs and competition, and because he was tired of the business. Although Wife only requested an imputation of income to Husband of $769 per month, which according to Wife's testimony was based on Husband's income from FNJ in 2000, the trial court, in calculating the PCSA, imputed income to him from FNJ of $1,000 per month. Husband claims that the evidence was insufficient to support this imputation of income.

■ It has long been recognized in the law that a parent will not be permitted to escape the responsibility to support the parent's children by deliberately limiting his or her work to reduce income. *Williams v. Williams*, 55 S.W.3d 405, 414 (Mo.App. W.D.2001). To avoid such a situation, the trial court may impute income to the parent in determining the court's child support award, based on what the parent could earn by using his or her best efforts.

*Id.* This fact is reflected in the Form 14 calculation of the PCSA. In determining a parent's gross monthly income, for purposes of Line 1, Form 14, income may be imputed "[i]f a parent is *unemployed* or found to be *underemployed.*" Civ. P. Form No. 14, DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, Line 1: Gross Income, Direction (emphasis added). As such, the imputation of income is appropriate not only where a parent voluntarily quits employment without justification to avoid paying child support, a case of unemployment, but also where he or she voluntarily reduces work without justification to avoid paying child support, a case of underemployment. *Perkins v. Perkins,* 21 S.W.3d 184, 186 (Mo.App. S.D. 2000); *Smith v. Smith,* 969 S.W.2d 856, 858–59 (Mo.App. E.D.1998).

■ To impute income to a parent in determining an award of child support, there must be evidence in the record to support a finding that the parent has the capacity and opportunity to earn the income that is imputed. *Monnig v. Monnig,* 53 S.W.3d 241, 245 (Mo.App. W.D.2001). Thus, Civil Procedure Form No. 14, DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, Line 1: Gross Income, Comment H, provides:

When determining whether to include imputed income and, if so, the amount to include in a parent's 'gross income,' a court or administrative agency shall consider all relevant factors, including:

(1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;

(2) The parent's occupational qualifications;

(3) The parent's employment potential;

(4) The available job opportunities in the community; and

(5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

These factors are not all-inclusive or exhaustive, they are simply factors to be considered along with any other relevant factors in determining if and what amount to impute. The question then, in determining whether to impute income to a parent in calculating the Form 14 PCSA, is whether, applying all relevant factors, including those factors found in Comment H that are relevant, there is evidence to support a finding that the parent is deliberately limiting his or her work to reduce income to avoid paying child support. *Davis v. Dep't of Soc. Servs., Div. of Child Support Enforcement,* 21 S.W.3d 140, 141 (Mo. App. W.D.2000).

Husband was employed and working full time for Carondelet Health Systems, earning an annual salary of $76,647. However, Wife contended at trial that Husband was underemployed in that although he claimed that FNJ was no longer in operation, based on past history, Husband, using his best efforts, was capable of earning $769 per month from the business, which Wife requested the trial court impute to Husband for purposes of child support. Wife also claimed FNJ was in fact still operating and earning money contrary to Husband's denial. It is not possible to know whether the trial court imputed income to Husband because he voluntarily limited his income by causing the termination of the Carondelet contract, because he did not pursue other contracts, or merely because FNJ was an ongoing busi-

ness that was generating income. The court simply found that "[h]e also runs a business, FNJ. He is capable of earning at least $1,000 per month in this business." Hence, our analysis involves determining whether the evidence was sufficient to support the trial court's finding that Husband, using his best efforts, could earn, at least, $1,000 per month from operating FNJ. We must do so in light of all relevant factors, including the factors of Comment H.

The record establishes that for several years prior to the filing of the dissolution proceeding, FNJ's profitability was steadily declining. In that regard, FNJ's tax returns for the five preceding years reflect that FNJ had taxable income of:

$52,127 in 1995;

$43,552 in 1996;

$30,731 in 1997;

$26,425 in 1998;

$9,206 in 1999; and,

$9,238 in 2000.

Wife's request for imputation of income of $769 per month was based on FNJ's income in 2000, while the trial court's imputation of $1,000 per month was perhaps based on averaging FNJ's income for three years prior to the dissolution proceeding commencing—1998, 1999, and 2000 ($1,246.36 per month). Although the Form 14 imputation factors permit past earnings to be considered in determining whether the imputation of income is appropriate and in what amount, it is well settled that "[p]roof that a parent has previously made more money ... is not alone a sufficient basis upon which to impute income at those levels." *Haden v. Riou*, 37 S.W.3d 854, 861 (Mo.App. W.D.2001). There must also be evidence of available employment in the community for which the parent is not only qualified, but from which he could earn the amount sought to be imputed. *Silverstein v. Silverstein*, 943 S.W.2d 300, 302 (Mo.App. E.D.1997).

For several years prior to the parties' dissolution proceeding, FNJ only had one contract—a contract to clean the Carondelet Health Campus, which consisted of the Carondelet Medical Building, St. Joseph Medical Mall, and St. Joseph Medical Building. The Carondelet service agreement was terminated effective June 30, 2001, pursuant to a letter of May 31, 2001, from Lioness Realty Group, Inc., (Lioness), which managed the Carondelet properties. That letter reads:

May 31, 2001

Mr. Frank Sherman

FNJ Maintenance Management, Inc.

10   East 127th Terrace

Re:  Carondelet Medical Building, St. Joseph Medical Mall & St. Joseph Medical Building

Dear Frank:

Please let this letter serve as thirty (30) day notice that the janitorial service agreement with FNJ Maintenance Management, Inc. for the above referenced buildings will be terminated effective midnight, June 30, 2001.

We will be transitioning to a new janitorial service provider, which will begin July 1, 2001, and ask that you continue to provide service for the three medical buildings through the month of June.

Frank, we anticipate a smooth transition of the janitorial service, and your questions and suggestions regarding this transition and the general janitorial service of the properties are welcome.

Sincerely,

Joseph D. Albertson

Vice President—Property Operations

JDA/ja

Cc:  Norma Brown

Gary Clifton

Jim Stacy

The reason for the termination of the contract was not fully developed at trial but there was evidence that Husband did not re-bid the contract in 2001. As to that issue, Husband testified on cross-examination:

Q. Mr. Sherman, did FNJ bid on the contracts for the Carondelet Health Campus in 2001?

A. No, we did not.

■ Although there was considerable evidence to the contrary, "[t]he trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). "When determining the sufficiency of the evidence an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *Id.*

Husband also stated that he did not try to find other work for FNJ after the Carondelet contract was terminated. He testified that his reasons for not doing so were "... the market, the competition, and the headache. I'm tired of it." No evidence was presented to indicate there were other opportunities for FNJ or the probable income that could be earned from those opportunities. Taken together with the evidence that he did not re-bid the Carondelet contract, the trial court could have reasonably inferred that Husband voluntarily reduced his income.

Another theme played out by Wife during trial was that FNJ was still operating despite Husband's assertion to the contrary. Wife introduced documents from the company that processes FNJ's payroll to show that Husband was underreporting FNJ's income. The records indicated payroll activity between July 18, 2001, and October 31, 2001, a period after the termination of the Carondelet contract. The court could have used this evidence to support a finding that FNJ was still operating.

Again, we do not know the precise reason the court imputed income to Husband. Regardless, the evidence does not support the imputed amount of $1,000 a month. Historically, Husband has demonstrated an ability to earn income through his FNJ enterprise. But, the evidence in this somewhat unique case is insufficient to support the value imputed to his ability.

Apparently the trial court focused exclusively on FNJ's earnings for the previous three years to impute the $1,000 per month amount, perhaps, as indicated above, through some kind of averaging. However, Comment H to Form 14 makes it clear that the process to impute income is both backward looking and forward looking. In addition to a parent's work history, the court must consider future employment and income potential and the availability of earning opportunities in the community. Indeed, the first non-exclusive factor listed in Comment H directs the court to consider the parent's probable earnings based on his or her work history during the past three years—if such time period would be appropriate. In this case, it had been some three years prior to trial since FNJ had revenue anywhere near $1,000 a month. We also note that the earnings decline predates the filing of the petition for dissolution. Where income is relatively steady or historically fluctuates, averaging revenue from previous years might be a good predictor of future income. However, in this case it is not.

■ The most obvious conclusion we can reach from a review of FNJ's financial history is that its income was dramatically and consistently dropping, from a high of $52,127 in 1995, to $9,238 in 2000. To impute income of $12,000 per year to Husband requires an inference that the steep

decline in FNJ's earnings would not only be halted but would be reversed. There is simply no evidence in the case from which to make this inference. We give great deference to a trial court's conclusions, but those conclusions still must be based upon substantial evidence. *Baker v. Baker*, 60 S.W.3d 19, 24 (Mo.App. E.D.2001). " 'Although a court is permitted to impute the income to a parent that he or she earned in the past, an award of child support must always be supported by evidence of the parent's ability to pay.' " *Haden*, 37 S.W.3d at 861 (quoting *State ex rel. O.A. v. Anthony*, 947 S.W.2d 832, 835 (Mo.App. W.D.1997)).

The purpose of imputation of income is to provide the appropriate level of support for the children. If a parent is deliberately limiting income to escape family responsibilities imputation encourages the parent to take advantage of income producing opportunities. The ultimate goal in preventing underemployment is to garner more assets for the family. However, imputing an amount that has no basis in the evidence or is beyond the capability of the parent does not legitimately achieve this goal.

Even assuming FNJ would have re-bid and secured the Carondelet contract, there is no substantial evidence from which to impute $1,000 a month in income to Husband. Although there was evidence of continued payroll activity, the amount of income, if any, generated by that activity was never established.

In summary, while there is evidence to support the conclusion that Husband voluntarily reduced his income, the record simply does not support the imputation of income in the amount of $1,000 per month as the trial court did. As the record now stands, it is impossible to determine what the appropriate amount of imputation would be, not knowing what FNJ might have realistically hoped to realize in income from available opportunities. Thus, because the imputation of income is critical to the trial court's mandatory calculation of the PCSA in the first step of the procedure for determining child support outlined in *Woolridge v. Woolridge*, 915 S.W.2d 372 (Mo.App. W.D.1996) (the "*Woolridge* procedure"), we must reverse and remand the court's award for further proceedings to allow the trial court to reconsider the issue of imputation of income to Husband and compute the PCSA accordingly.

### Point II

In Point II, Husband claims that the trial court erred in rebutting the PCSA as being unjust and inappropriate for not being "sufficient to cover the reasonable needs of the children" and ordering him to pay $1,500 per month in child support because in doing so, the court failed to consider all relevant factors, as required by Rule 88.01. Specifically, he claims that in rebutting the PCSA and ordering him to pay $1,500 a month in child support, the trial court was required, but failed, to consider his "financial resources and needs." Thus, the question presented concerns whether the trial court erroneously declared and applied the law with respect to the rebuttal step of the *Woolridge* procedure in ordering child support.

Logically, the resolution of the claim raised in this point is contingent on what the record would support as being Husband's financial resources with which to meet his child support obligation. And, of course, that cannot be determined until the imputation of income issue discussed in Point I is resolved on remand. Moreover, on remand, the resolution of the imputation issue may cause the trial court's child support award to ultimately change, which would directly bear on the issue of wheth-

er Husband has the financial means with which to satisfy the court's award, whatever it might be. Thus, the issue of whether Husband is financially able to pay the child support amount ordered is not ripe for our review.

## Point III

■ In Point III, Husband claims that: The trial court erred in the division of marital property because case law and § 452.330, R.S.Mo., 1998, holds that if the division of marital property is not fair it is an abuse of discretion such as in this case where the division is so heavily weighted in favor of respondent that it amounts to an abuse of discretion.

As explained below, we find this point relied on fails to satisfy the requirements of Rule 84.04(d), governing a proper point relied on, so it preserves nothing for our review. *Coyne v. Coyne*, 17 S.W.3d 904, 906 (Mo.App. E.D.2000).

■ Rule 84.04(d) requires that each point relied on: "(1) identify the trial court's ruling or action that the appellant is challenging on appeal; (2) state the legal reasons for the appellant's claim of reversible error; and (3) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.'" *Wilson v. Carnahan*, 25 S.W.3d 664, 666 (Mo.App. W.D.2000) (quoting *Hall v. Mo. Bd. of Prob. & Parole*, 10 S.W.3d 540, 543 (Mo.App. W.D. 1999)). Husband's Point III fails to sufficiently explain in summary fashion why, in the context of the case, the legal reasons asserted support the claim of reversible error, as required by Rule 84.04(d)(1)(C). Where, as here, a point relied on sets out a mere abstract statement of law and does not explain why the legal reason or reasons asserted support the claim of reversible error, it is deficient and preserves nothing for appeal. Rule 84.04(d)(4); *Crawford County Concerned Citizens v. Mo. Dep't of Natural Res.*, 51 S.W.3d 904, 908 (Mo.App. W.D.2001).

Point dismissed.

## Conclusion

The judgment of the trial court is affirmed in all respects except its award of child support, which is reversed, and the case is remanded for the trial court to reconsider the issue of imputation of income to Husband in calculating the PCSA and enter its child support order, all in accordance with the mandatory *Woolridge* procedure, Civil Procedure Form 14, Rule 88.01, § 452.340, and this opinion. The court may take additional evidence on this issue.

SMITH, C.J. concurs in separate concurring opinion.

BRECKENRIDGE, J. dissents in separate dissenting opinion.

EDWIN H. SMITH, Chief Judge, concurring.

While I concur with the result reached by Judge Howard in the majority opinion as to all three points of error raised by the appellant, I write to clarify and expand on the rationale for the result reached in Point I, concerning the issue of imputation of income to the appellant in determining the trial court's award of child support, and in general, to clarify and expand on the law of imputation.[1]

1. This case was submitted on July 29, 2003 and assigned to me as the writing judge. In my proposed majority opinion, I reached the same result, in all three points, as Judge Howard now reaches in his majority opinion. Nonetheless, as the Presiding Judge of the Division, I re-assigned the case to Judge Howard on December 15, 2003, based on my

In Point I, the appellant claims that the trial court erred in awarding the respondent child support, as calculated pursuant to the court's own Form 14 worksheets, based, in part, on imputed gross monthly income to the appellant of $1000 for earnings from the family business, FNJ, awarded by the court to the appellant as his property, because the imputation of income was not supported by the record. Specifically, he claims that the record did not support the imputation of income to the appellant in that there was insufficient evidence from which the court could find that the appellant, exercising his best efforts, was capable of realizing gross income from FNJ of, at least, $1,000 per month.

Our standard of review, with respect to child support rulings, is set forth in *Conrad v. Conrad*, 76 S.W.3d 305, 308 (Mo. App.2002) (footnotes and internal citations omitted):

> In determining an award of child support in any proceeding, § 452.340.8 and Rule 88.01 require the trial court to follow the two-step procedure set forth in *Woolridge v. Woolridge*, 915 S.W.2d 372, 379 (Mo.App.1996), which was approved by the Missouri Supreme Court in *Neal v. Neal*, 941 S.W.2d 501, 504 (Mo. banc 1997). In the first step, the trial court must determine and find for the record the PCSA in accordance with Form 14. This required determination and finding can be done by the trial court's either accepting for the record a Form 14 calculation of one of the parties, or in the event the court "rejects" their Form 14 calculations as being incorrect, by doing its own Form 14 calculation. The trial court can do its own Form 14 calculation by either completing a Form 14 worksheet and making it a part of the record or by articulating on the record how it calculated its Form 14 amount. In the second step, the court, after considering all relevant factors, must determine whether to rebut the PCSA as being unjust or inappropriate. Our review then of an award of child support is essentially one of the trial court's application of the two-step *Woolridge* procedure, applying the standard enunciated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Hence, in reviewing an award of child support, we review the award, in light of the trial court's application of the *Woolridge* procedure, to determine whether it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. After reviewing and determining that the trial court's application of the *Woolridge* procedure passes the *Murphy v. Carron* standard, we then review for an abuse of discretion with respect to the trial court's rebuttal review of its PCSA calculation.

In determining its child support award, the trial court in our case rejected the parties' Form 14s and prepared its own. In fact, the trial court prepared two Form 14s, one reflecting an adjustment to the appellant's gross monthly income of $935 for maintenance and the other reflecting a maintenance adjustment of $185. This was done in accordance with the trial court's ordering an automatic future reduction in maintenance, from $935 to $185, upon the sale of the Marco Island Condominium awarded to the appellant in the court's division of property and his payment to the respondent of the first $150,000 in sale proceeds. Based on its

understanding that neither he nor Judge Breckenridge would concur in my proposed majority opinion.

two Form 14s, the trial court calculated two PCSAs: (1) $1003, based on the current maintenance award; and (2) $1102, based on the future reduced maintenance award. The trial court rebutted both amounts as being unjust and inappropriate, awarding child support of $1500 per month. Despite the fact that the trial court's maintenance award was to automatically decrease, and it calculated two PCSAs based on that fact, the trial court did not order an automatic increase in the child support award at the time of the automatic reduction in maintenance. Although I seriously question whether the law permits an automatic future modification of a child support award, given the trial court's calculation of two PCSAs, based on the automatic future reduction in maintenance, logically, I would have expected the trial court to order a concomitant automatic reduction in child support. In any event, inasmuch as the issue of an automatic future modification of child support is not raised by the appellant and our review of the imputation of income claim presented does not ultimately rest on a resolution of that issue, I do not address it.

In calculating the required PCSA, pursuant to Form 14, the trial court is required to determine each party's gross monthly income. In that regard, the trial court here found, in both of its Form 14 worksheets, that the appellant's gross monthly income was $7615, including $1000 for the income the court found he was capable of earning from the family business, FNJ. However, the appellant contended at trial that FNJ was defunct and had no income. He testified that the company's only service contract had been terminated as of June 30, 2001 and that he had not sought any other contracts. Although the respondent only requested an imputation of income to the appellant of $769 per month, which according to the respondent's testimony was based on the

appellant's income from FNJ in 2000, the trial court, in calculating the PCSA, imputed income to him from FNJ of $1,000 per month. The appellant claims that the evidence was insufficient to support the imputation of income, in any amount.

**A. In determining its Form 14 PCSAs, was it proper for the trial court to impute income, in any amount, to the appellant?**

It is well settled in the law that a parent will not be permitted to escape his responsibility to support his children by deliberately limiting his work in order to reduce income. *Williams v. Williams*, 55 S.W.3d 405, 414 (Mo.App.2001); *Haden v. Riou*, 37 S.W.3d 854, 861 (Mo.App.2001); *Davis v. Dep't of Soc. Servs.*, 21 S.W.3d 140, 141 (Mo.App.2000); *Perkins v. Perkins*, 21 S.W.3d 184, 186 (Mo.App.2000); *Smith v. Smith*, 969 S.W.2d 856, 858 (Mo.App.1998); *Silverstein v. Silverstein*, 943 S.W.2d 300, 302 (Mo.App.1997); *Walker v. Walker*, 936 S.W.2d 244, 247 (Mo.App.1996); *Hansen v. Phenicie*, 917 S.W.2d 618, 619 (Mo.App. 1996); *Jensen v. Jensen*, 877 S.W.2d at 131, 136 (Mo.App.1994). To prevent a parent from avoiding his responsibility to support his children, a trial court may, in proper circumstances, impute income to the parent in determining the court's child support award, based on what the parent could earn by using his best efforts. *Williams*, 55 S.W.3d at 414; *Haden*, 37 S.W.3d at 861; *Perkins*, 21 S.W.3d at 186; *Silverstein*, 943 S.W.2d at 302; *Walker*, 936 at 247; *Jensen*, 877 S.W.2d at 136. "However, it is axiomatic that there must be evidence to support a finding that the parent is deliberately limiting his or her work to reduce income before it is appropriate to impute income." *Davis*, 21 S.W.3d at 141. In other words, "[c]ourts should not impute income where the record does not establish an attempt to evade parental responsibilities." *Smith*, 969

S.W.2d at 859. What constitutes appropriate circumstances to impute income will depend on the facts of the individual case and are to be determined on a case-by-case basis. *Id.; Perkins*, 21 S.W.3d at 186.

Line 1: Gross Income of Form No. 14, DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, provides, in pertinent part, that income may be imputed "[i]f a parent is *unemployed* or found to be *underemployed.*" (Emphasis added.) Proper circumstances for imputing income, in determining child support, include both voluntary and involuntary reductions of income by a parent's being unemployed or underemployed. *Silverstein*, 943 S.W.2d at 302; *Walker*, 936 S.W.2d at 247–48. Imputation of income is proper where a parent has voluntarily reduced his or her income *without justification. Perkins*, 21 S.W.3d at 186; *Hansen*, 917 S.W.2d at 619; *Walker*, 936 S.W.2d at 247; *Jensen*, 877 S.W.2d at 136. The most common scenario for voluntary reduction of income without justification is where a parent deliberately quits work to reduce his or her child support. *Hansen*, 917 S.W.2d at 619; *Jensen*, 877 S.W.2d at 136. Imputation of income is also appropriate where the parent voluntarily reduces his or her income *with justification,* but only if the evidence shows that the parent had failed to use his or her best efforts to obtain new employment. *Perkins*, 21 S.W.3d at 186; *Silverstein*, 943 S.W.2d at 302. Likewise, an imputation of income is proper on that same showing where a parent has had his or her income *involuntarily* reduced, which would include termination of employment. *Id.; Walker*, 936 S.W.2d at 247–48.

The trial court here found that the appellant was working full time for Carondelet Health Systems, earning an annual salary of $76,647 ($6387.25/month). How-ever, the respondent contended at trial that the appellant could earn more, or in other words, was underemployed, in that although the appellant claimed that the family business, FNJ, was no longer operating, based on past history, the appellant, using his best efforts, was capable of earning $769 per month from the business, which the respondent requested the trial court impute to the appellant. The trial court agreed with the respondent that the appellant was underemployed and imputed income to him in calculating its child support award. However, rather than imputing the $769 the respondent requested in her Form 14, the trial court imputed $1,000 per month to the appellant, finding in its judgment that "[h]e also runs a business, FNJ. He is capable of earning at least $1,000 per month in this business."

In determining the appropriate circumstances to impute income, **Comment H** of **Line 1: Gross income** provides:

When determining whether to include imputed income and, if so, the amount to include in a parent's 'gross income,' a court or administrative agency shall consider all relevant factors, including:

(1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;

(2) The parent's occupational qualifications;

(3) The parent's employment potential;

(4) The *available job opportunities in the community;* and

(5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

(Emphasis added.) Pursuant to the express terms of **Comment H**, these factors are to be considered not only in determining "whether to include imputed income," but the "amount" to impute. And, inasmuch as **Comment H** requires that "all relevant factors" are to be considered in determining whether to impute income and in what amount, the factors expressly stated in the comment are not exhaustive. Thus, in deciding whether the record here supports the trial court's imputing gross monthly income of $1000 to the appellant from FNJ, in calculating the required PCSA, the question is whether there is sufficient evidence in the record from which the trial court could find, in light of all relevant factors, including those set out in **Comment H**, that the appellant *voluntarily* or *involuntarily* reduced his income from FNJ, in order to avoid paying additional child support.

The respondent did not articulate below or on appeal whether she was contending that the appellant was underemployed because he *voluntarily* or *involuntarily* reduced his income from FNJ. Assuming for the sake of argument that she was and is contending that he *voluntarily* reduced his income from FNJ, for the trial court to impute income to the appellant on that basis, there had to be evidence in the record from which the trial court could find that the appellant *quit* doing business as FNJ. In that regard, the only evidence introduced by the respondent on the issue of the nature of FNJ's business was FNJ's tax returns for the five preceding years, showing that for several years prior to the filing of the dissolution proceeding, its work was steadily declining. Those records reflect that FNJ had taxable income of $52,127 in 1995, $43,552 in 1996, $30,731 in 1997, $26,425 in 1998, $9206 in 1999, and $9238 in 2000. The respondent's request to impute income to the appellant of $769 per month was based on FNJ's income in

2000 ($9238/12), while the trial court's imputation of $1000 per month appears to be based on the three years prior to the dissolution proceeding commencing, 1998, 1999, and 2000 ($44,869/36 = $1246.36). Although the imputation factors of **Comment H** require the trial court to consider the "parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods," it is well settled that proof that a parent has previously made more money is not a sufficient basis alone on which to impute income. *Williams*, 55 S.W.3d at 415; *Haden*, 37 S.W.3d at 861; *Perkins*, 21 S.W.3d at 186; *Walker*, 936 S.W.2d at 248; *Silverstein*, 943 S.W.2d at 302.

The appellant's tax returns do not indicate the source of FNJ's income. And, the respondent, for some unexplained reason, chose not to put on any evidence to show the service contracts of FNJ at any period of time and what it was making from those contracts. The only evidence on that issue came from the appellant who testified that for several years prior to the parties' dissolution proceeding being filed, FNJ only had one service agreement, a contract to clean the Carondelet Health Campus, which consisted of the Carondelet Medical Building, St. Joseph Medical Mall, and St. Joseph Medical Building. In her testimony, the respondent essentially conceded this point when she testified that she did not have any knowledge whether FNJ had any contracts other than the one with Carondelet. In any event, even if the trial court chose to disbelieve the appellant's testimony as to FNJ's only having one service contract, that would mean that there was no evidence in the record as to how many service agreements FNJ had during the relevant time frame and wheth-

er the appellant had terminated them without justification. In other words, inasmuch as the appellant did not have to offer any evidence on the issue of imputation,[2] the fact that we cannot consider the evidence favorable to him on appeal because it is not in a light most favorable to the trial court's decision to impute income to him, does not win the day for the respondent, as Judge Breckenridge seems to contend in her dissent. This is so in that such a contention ignores the fact that in disregarding the appellant's favorable evidence, there is no evidence in the record as to what contracts FNJ had at what period of time and what the appellant did, if anything, to *voluntarily* terminate them, without justification, so as to avoid paying child support.

Judge Breckenridge, in her dissent, in arguing that I am not viewing the evidence

in a light most favorable to the decision of the trial court, with respect to imputing income to the appellant, fails to appreciate the distinction between a case of credibility and competing inferences, in which we are to defer to the trial judge, and a case, such as this case, where there is no evidence from which the trial court can make the requisite findings to support its decision. While "[w]e [are to] view the evidence in the light most favorable to the prevailing party, [ . . . ] we do not . . . give the plaintiff the benefit of unreasonable, speculative or forced inferences." *Gray v. White*, 26 S.W.3d 806, 820 n. 10 (Mo.App.1999) (*quoting Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App.1997)); *see also Monnig*, 53 S.W.3d at 247. The problem for the respondent's position and with Judge Breckenridge's dissent is that, even if the trial court disbelieved absolutely every shred of

2. In *Holmes v. Holmes*, 878 S.W.2d 906, 910 (Mo.App.1994), the Eastern District of this Court stated that the husband, the party against whom imputation was sought in the determination of child support, had the "burden of proving that his dismissal [from his employment] and subsequent decrease in income were involuntary," relying on *Forhan v. Forhan*, 693 S.W.2d 164, 166 (Mo.App.1985). *See also State ex rel. Cote v. Kelly*, 978 S.W.2d 812, 815 (Mo.App.1998) (in which the Southern District followed the Eastern District's lead in *Holmes*). The court's reliance on *Forhan* is misplaced in that it was not an imputation case. In *Forhan*, the husband sought to modify his child support obligation, in accordance with § 452.370, RSMo 2000, based on an allegation that there had been a substantial and continuing change in his circumstances in that his income had been substantially reduced from the loss of employment. 693 S.W.2d at 165. Thus, as the movant, he had the burden of proving this allegation, § 452.370.2, RSMo 2000, in order to be successful on his motion to modify. *Id.* It is this burden that the court is referencing in *Forhan*, 693 S.W.2d at 166, not the burden with respect to the issue of imputation of income. In *Forhan*, the issue was whether the loss of income was voluntary or involuntary for purposes of determining whether

there was a substantial and continuing change of circumstances warranting the modification of the child support award. *Id.* at 165. The fact of the matter is that § 452.340, RSMo 2000, governing child support, does not speak to the issue of imputation of income and any corresponding burden of proof. Rather, with respect to the guidelines for determining child support, § 452.340.8, RSMo 2000, simply mandates that the Missouri Supreme Court establish such guidelines, the result being Form 14. And while, Form 14 expressly authorizes the imputation of income, it does not speak to a burden of proof. Generally speaking, the burden of proof, absent express guidance in the controlling procedural statute or rule, would be on the plaintiff or petitioner, as in other civil proceedings. *Kinzenbaw v. Dir. of Revenue*, 62 S.W.3d 49, 53 (Mo. *banc* 2001). With this as a polestar, I believe that the burden of proof should be on the proponent of imputing income, the respondent in our case. In any event, inasmuch of the lack of evidence in the record to support imputation would result in no imputation of income being permitted, the practical effect in this case would be the same, regardless of whether we were to expressly hold that the proponent, the respondent, had the burden of persuasion on the issue of imputation of income.

evidence favorable to the appellant, that would leave the record devoid of any evidence as to how many contracts FNJ had and whether the appellant had quit or terminated those contracts. The only evidence in the record indicates that FNJ had been profitable, but that its profitability had been declining, to the point that for the last two years prior to dissolution it only showed income of approximately $9200 per year. The respondent did not present any evidence as to whether this income came from one or more contracts.

Even assuming that the respondent carried her burden of showing that FNJ must have had at least one service agreement during the pertinent times of inquiry due to the tax records she introduced, showing income of approximately $9200 per year, she did not introduce any evidence to show that the appellant voluntarily terminated such service agreements. In that regard, the only evidence introduced as to the appellant's voluntarily terminating FNJ service agreements was a termination letter, dated May 31, 2001, which was sent to the appellant by Lioness Realty Group, Inc., which managed the Carondelet properties, terminating the Carondelet janitorial service agreement with FNJ. That letter reads:

May 31, 2001

Mr. Frank Sherman

FNJ Maintenance Management, Inc.

10   East 127th Terrace

**Re: Carondelet Medical Building, St. Joseph Medical Mall & St. Joseph Medical Building**

Dear Frank:

Please let this letter serve as thirty (30) day notice that the janitorial service agreement with FNJ Maintenance Management, Inc. for the above referenced buildings will be terminated effective midnight, June 30, 2001.

We will be transitioning to a new janitorial service provider, which will begin July 1, 2001, and ask that you continue to provide service for the three medical buildings through the month of June.

Frank, we anticipate a smooth transition of the janitorial service, and your questions and suggestions regarding this transition and the general janitorial service of the properties are welcome.

Sincerely,

Joseph D. Albertson

Vice President—Property Operations

JDA/ja

Cc:  Norma Brown

   Gary Clifton

   Jim Stacy

From this letter, it is impossible, without engaging in pure speculation, which we cannot do, to infer which party terminated the service agreement. There is nothing in the letter that would allow the trial court to infer reasonably one way or the other which party terminated the agreement. And, while there is evidence in the record that the appellant did not bid on the new Carondelet contract, it cannot be reasonably inferred from that fact that the appellant was responsible for terminating the old contract. Logically, the need to re-bid a contract does not arise unless and until the existing contract is terminated or has expired by its terms. Thus, it would be circular logic, at best, to argue that it could be inferred from the appellant's failure to bid the new Carondelet contract that he caused the termination of the old contract, which, in turn, caused the bidding of the new contract in the first instance. There simply is no evidence in the record from which the trial court could reasonably infer that the Carondelet contract, or any other existing contract for that matter, was voluntarily terminated by the appellant.

The respondent did offer evidence at trial of what she referred to as "payroll activity" of FNJ, between July 18, 2001, and October 31, 2001, which was after the termination of the old Carondelet contract. This evidence consisted of documents from Automatic Data Processing, the company that processed the payroll for FNJ. However, I fail to see how this evidence would tend to show that the appellant intentionally terminated FNJ service agreements to reduce his income and avoid paying child support. While the evidence of "payroll activity," post termination of the Carondelet agreement, might tend to support an inference of the appellant's underreporting income from the clandestine operation of FNJ, it logically does not support a reasonable inference that the appellant voluntarily terminated or quit existing service agreements of FNJ, without justification, including terminating FNJ's service agreement with Carondelet.

The respondent also introduced evidence concerning the appellant's doing lawn care and snow removal jobs for extra money. She did not, however, contend at trial that this was income of FNJ and that the trial court should impute any of it to the appellant in determining child support. The appellant testified at trial that he had ceased doing those jobs approximately six weeks prior to trial, which testimony the trial court was free to believe or disbelieve. In any event, even if believed, this evidence of respondent does not shed any direct light on what FNJ service agreements were in effect and whether the appellant voluntarily terminated them. At best, from the respondent's perspective, it simply demonstrates a general tendency by the appellant to avoid his responsibility to support his children.

For the reasons stated, I do not believe that there is sufficient evidence in the record from which the trial court could

reasonably infer what service agreements FNJ had that were voluntarily terminated by the appellant, without justification, to reduce his income in order to avoid paying any additional child support, such that the imputation of income to the appellant would have been proper on that basis. However, this does not end the inquiry. As I discuss, *supra*, the imputation of income is not only proper in an underemployment situation where there is a *voluntary* reduction of income, without justification, but where there is an *involuntary* reduction of income and the parent fails to use his or her best efforts to obtain new employment, or in this case, where the appellant failed to seek available business in the community for FNJ. In that regard, Comment H of Line 1 of Form 14 would logically apply to voluntary or involuntary reductions such that the question becomes whether there is sufficient evidence in the record, in light of all relevant factors, including the five factors of Comment H, from which the trial court could have reasonably concluded that the appellant, using his best efforts, could have obtained new janitorial service agreements for FNJ, after the termination of the old Carondelet agreement, but voluntarily chose not to do so.

As we noted, *supra*, proof of past earnings alone is not sufficient to impute income. *Williams*, 55 S.W.3d at 415; *Haden*, 37 S.W.3d at 861; *Perkins*, 21 S.W.3d at 186; *Silverstein*, 943 S.W.2d at 302; *Walker*, 936 S.W.2d at 248. In order for a parent to carry his or her burden for imputing income to the other parent, where the other parent's income has been *involuntarily* reduced, the parent seeking to impute must demonstrate that there were employment opportunities available in the community for which the other parent is qualified and has the capability of earning income. *Williams*, 55 S.W.3d at 416; *Silverstein*, 943 S.W.2d at 302; *Walk-*

*er,* 936 S.W.2d at 248; *Cowen,* 869 S.W.2d at 776–77. Of course, in this case, we are not dealing with the appellant's efforts to obtain employment, but his efforts to obtain available business for FNJ. In that regard, the record here is absolutely void of any evidence of there being any janitorial service agreements available to FNJ in the community similar to those it had previously, other than the new Carondelet agreement that was bid after the termination of the old agreement.

As to the new Carondelet agreement, the appellant testified under cross-examination by the respondent's attorney:

Q. Mr. Sherman, did FNJ bid on the contracts for the Carondelet Health Campus in 2001?

A. No, we did not.

Q. So you—

A. It was the same—same amount as—we didn't change the—that it was from the previous years.

Q. You did not actively pursue or bid on—on renewing those contracts?

A. Yes, I just told him the—the amount would be the—the same.

While the trial court could reasonably infer from this that FNJ failed to bid on the new Carondelet agreement, there is nothing in his testimony from which it could be inferred that there were other similar job opportunities available on which to bid and that the appellant failed to do so. Nonetheless, the fact that the appellant failed to bid on the new Carondelet contract was sufficient for the trial court to find that the appellant was not using his best efforts to obtain new contracts for FNJ and to impute income on that basis. FNJ clearly had the expertise and the opportunity to bid on the contract, and chose not to do so, without any justification. The question then becomes, in determining whether the evidence was sufficient to support the trial court's imputation of income to the appel-

lant, whether the evidence supports imputation in the amount of $1000 per month.

**B. Did the evidence support imputation of income in the amount of $1000 per month, based on the jobs available to FNJ in the community?**

Common sense tells us that the trial court is not permitted to simply snatch a figure out of thin air in imputing income. While a trial court can rely on reasonable inferences in determining whether to impute income, it cannot rely on speculation. *Monnig,* 53 S.W.3d at 247. Obviously, the mere availability of employment in the community is not the lone factor in determining the amount to impute to a parent in determining child support. It must be the type of employment from which the parent could earn the amount to be imputed. Thus, to support the imputation of income, there not only has to be substantial evidence that a parent could earn more using his best efforts, there also has to be substantial evidence demonstrating that the parent has the capacity to earn the amount of income to be imputed. *Williams,* 55 S.W.3d at 416; *Walker,* 936 S.W.2d at 248; *Cowen,* 869 S.W.2d at 776–77; *Silverstein,* 943 S.W.2d at 302. Thus, inasmuch as the record here, at best from the perspective of the respondent, only supports an inference that there was one janitorial service agreement available in the community on which FNJ could have bid, to support the trial court's imputation of income to the appellant of $1000 per month, the respondent had the burden of showing that the appellant would have been able to realize income from that contract of at least the amount imputed.

The respondent failed to present any evidence as to the terms of the new Carondelet contract. Instead, in support of her request that the trial court impute monthly income to the appellant in the amount of

$769, she relied solely on her evidence as to what FNJ reported in income for 2000 ($9228/12). While past income is a factor to be considered in determining whether to impute income and in what amount, factor 1 of **Comment H** recognizes that, depending on the circumstances, the parent's work history for the three years immediately preceding the commencement of the dissolution proceeding may or may not be an accurate predictor of probable earnings. This is made crystal clear from the fact that factor 1 provides that probable earnings may be determined by looking at the parent's work history for "such time period as may be appropriate" and "during any other relevant time periods." **Form 14:Line 1, Comment H(1).** Thus, in cases of involuntarily reduction of income, such as ours, there can be no hard and fast rule that evidence of past income alone is sufficient in every instance to impute income, regardless of what the present available jobs in the community would pay. To suggest otherwise would mean that the trial court could impute income to an involuntarily unemployed parent based on the parent's past earnings as a nurse, doctor, lawyer, accountant, etc., even though the evidence failed to show the availability of any jobs opportunities in the community other than minimum wage jobs.

In determining what factors should be considered in this case in determining the proper amount of income to impute to the appellant, one must consider that unlike monthly earnings from hourly or salaried jobs, which would tend to be fairly stable over a period of time, monthly earnings from one business contract to the next would tend to be widely varied and extremely fluid, depending on the competition, expenses, etc. in the particular type of business in question. It follows then that while past earnings would generally be a strong indicator of future income as to similar hourly and salaried jobs, they would not be as strong in the case of monthly earnings from a business subject to the vagaries of ever changing contractual relationships. Thus, in this case, while past earnings of FNJ from former janitorial service agreements is relevant and would shed some light on what it was capable of earning from the new Carondelet contract, those earnings would not paint a complete picture and would not, standing alone, be substantial evidence of what FNJ could reasonably be expected to earn from that contract in the future.

The distinction I raise between hourly/salaried jobs and business contracts is, of course, in keeping with **Comment H.** Imputation of income is done on a case-by-case basis and whether past earnings is an accurate predictor of the imputation of income depends on the circumstances of the individual case. Thus, logically, depending on the circumstances, this distinction may well be a relevant factor in determining whether the evidence is sufficient to support the amount of the income to be imputed by the trial court.

It goes without saying that factors 1 and 4 of **Comment H** are inextricably intertwined. Factor 1 concerns "probable earnings" based on past work history, while factor 4 concerns job opportunities. Logically, to determine probable earnings, meaning earnings that could be earned in the future, one cannot solely rely on past work history, but must look at the available employment opportunities. Circumstances sometimes change through no fault of the parent, such that past earnings would not paint an accurate picture of what the parent could reasonably expect to earn in the future, if using his best efforts. This would be especially true in cases where imputation is based on the parent's not using his best efforts to obtain employment, as opposed to cases where imputa-

tion is based on the parent's quitting existing employment.

Contrary to Judge Breckenridge's Chicken Little argument in her dissent, in contending as I do, I would not require evidence that the appellant would have, in fact, received the bid on the new Carondelet contract had it submitted one. My analysis would simply require that there be evidence from which it can be reasonably inferred the amount of income that the appellant could have reasonably realized, doing business as FNJ, assuming that it had successfully bid the new Carondelet contract. And, contrary to Judge Breckenridge's protestations, this was not an impossible task. Obviously, the respondent, had she been so inclined, could have put on evidence as to the terms of the new contract that was agreed upon by Carondelet and the new janitorial service. I would require no more than is required in typical unemployment or underemployment cases involving income from hourly or salaried employment, as opposed to income from business. In such cases, there must not only be evidence that jobs are available to the parent in the community, but evidence from which it can be reasonably inferred that the parent could earn income therefrom in the amount to be imputed, had the parent sought and obtained the employment. *Williams,* 55 S.W.3d at 416; *Walker,* 936 S.W.2d at 248; *Cowen,* 869 S.W.2d at 776–77; *Silverstein,* 943 S.W.2d at 302. To require otherwise, proof of *any* job opportunities in the community would be sufficient to impute income in *any* amount supported by the parent's past earnings, even if there was no evidence that the present job opportunities would allow the parent to earn income at the same level as past earnings. That is illogical and not the law.

Here, the respondent's own evidence demonstrated that FNJ's earnings had steadily declined for the last five years. The respondent presented no evidence as to why that had occurred, nor did she argue that point. In fact, in requesting imputation of $769 per month in income to the appellant, which reflected FNJ's last year of reported income, she essentially conceded the fact that the appellant's opportunity to earn income from FNJ was declining such that FNJ's prior years of income were not reliable indicators of what the appellant could earn in income from FNJ in the future. And, while there is nothing in the record as to why that had occurred, other than the appellant's testimony that competition and costs had increased, given the respondent's evidence of FNJ's declining earnings history and the lack of any evidence as to what could be earned from what the record discloses was the only job available to FNJ in the community, the new Carondelet contract, it was unreasonable for the trial court to infer that the appellant could realize income of, at least, $12,000 per year from that contract. In fact, without engaging in pure speculation, which it is prohibited from doing, *Monnig,* 53 S.W.3d at 247, the trial court could not determine what amount of income was reasonable to expect from the new Carondelet contract, including whether the $769 amount requested by the respondent was appropriate. This is so in that as I discuss, *supra,* income from one service contract to the next tends to be fluid, depending on the competition, expenses, etc., such that prior earnings *alone* in those cases are not generally reliable in determining future income. The respondent's own evidence established that FNJ's profitability had gone down for five straight years. And, there is no way to infer from the record before us how much further the market for FNJ was likely to fall for the next year.

In summary, while there is evidence to support the imputation of some amount of

income to the appellant from FNJ, specifically, evidence that the appellant did not use his best efforts to maximize his income from FNJ in that he failed to bid on the new Carondelet contract, which the respondent's evidence demonstrated was the only available business to FNJ in the community, the record simply does not support the imputation of income to the appellant in the amount imputed by the trial court, $1,000 per month. The fact is that on the record as it stands now, it is impossible to determine what the appropriate amount of imputation would be, not knowing what FNJ might have realistically hoped to realize in income if it had bid on and obtained the new Carondelet contract. Thus, because the imputation of income is essential to the trial court's mandatory calculation of the PCSA in the first step of the *Woolridge* procedure in determining its child support award, I would reverse and remand the court's award for further proceedings to allow it to reconsider the issue of imputation of income to the appellant and then compute its PCSA and enter its child support award accordingly. *Silverstein*, 943 S.W.2d at 302.

PATRICIA BRECKENRIDGE, Judge, dissenting.

While I concur in the majority's reversal of the award of child support because the evidence is insufficient to support the trial court's imputation to Mr. Sherman (Father) of $1000 monthly income from FNJ Maintenance Company, I dissent from the majority's holding that "it is impossible to determine what the appropriate amount of imputation would be." In reaching this conclusion, the majority fails to follow the standard of review and misapplies the law. Because there is sufficient evidence in the record to support the imputation of $769 monthly income from FNJ, this court should recognize the proper amount to be imputed and then remand to the trial court

with directions to reconsider whether the presumed child support amount should be rebutted in light of the lower monthly income of Father.

In reaching the conclusion that "it is impossible to determine what the appropriate amount of imputation would be," Judge Howard infers from the evidence, and Judge Smith agrees, that "for several years prior to the filing of the dissolution proceeding, FNJ's profitability was steadily declining." In support of this inference, they both rely on FNJ's taxable income for the five years proceeding the dissolution proceeding: $52,127 in 1995; $43,552 in 1996; $30,731 in 1997; $26,425 in 1998; $9,206 in 1999; and $9,238 in 2000. In determining whether there is sufficient evidence to support the trial court's decision, this court is required to view the evidence in the light most favorable to the trial court's judgment and disregard all contrary evidence and inferences. *Hatchette v. Hatchette*, 57 S.W.3d 884, 892 (Mo.App. 2001). The inference that should be made, under this standard of review, is that the income for FNJ steadily declined from 1995 until 1999, and then in 1999 and 2000 remained stable at the amount of $9,200.

Judge Howard goes on to require that there be evidence "what FNJ might realistically hoped to realize in income if it had bid on and obtained the new Carondelet contract" before the trial court could impute income to Father from FNJ. Judge Smith finds that "it is impossible to determine what the appropriate amount of imputation would be, not knowing what FNJ might realistically hoped to realize in income if it had bid on and obtained the new Carondelet contract." Father, by not bidding, created the circumstance where it is impossible to know the amount FNJ would have earned in 2001. Judges Howard and Smith's requirement that there must be evidence of what FNJ would have earned

if Father had bid for the Carondelet contract creates an impossible obstacle to the imputation of income to Father, thereby permitting Father to benefit from failing to use his best efforts to earn income, i.e., bidding on the contract.

In determining whether there was sufficient evidence to impute income in the amount of $769, the trial court and this court are to consider any evidence she presented, as well as evidence adduced in cross-examining Father. The evidence favorable to the trial court's judgment indicates that the parties formed and incorporated FNJ during the marriage. Father and Ms. Sherman (Mother) were the only shareholders of the corporation. Its purpose was to provide contract-cleaning services for businesses. Prior to the dissolution hearing, the corporation had been in continuous operation for fifteen years, and earned a profit every year, ranging from $9,200 to $52,000. The corporation remained a viable entity as of the trial date. The parties' average annual income from the corporation for the two years preceding the trial was $9,222.

The corporation's only contract, the Carondelet Health Campus contract, was terminated on July 1, 2001. Father admitted that he did not bid for the renewal of that contract, which the corporation had secured for the past fifteen years, or seek any other contracts, because he was "tired of it." Although Father testified that he was motivated to cease operations by increased competition and labor costs, the trial court obviously disbelieved this testimony and found that Father had intentionally reduced his income from FNJ at the time of the dissolution. *See Hill v. Hill,* 53 S.W.3d 114, 117 (Mo. banc 2001).

This evidence is sufficient to support an inference that Father intentionally quit operating FNJ to avoid paying child support in that he did not bid for renewal of the Carondelet contract because he was "tired of it," considering the fact that FNJ had operated profitably for fifteen years. Even though the trial court's decision to disbelieve Father as to his motive for failing to bid for renewal of the Carondelet contract was within its discretion and does not require support in the record to be upheld, the trial court's decision was supported by Father's failure to testify truthfully on other issues concerning FNJ and his lawn care and snow removal business, which he had also operated continuously throughout the parties' marriage. For example, Father testified that FNJ did not conduct business after July 1, 2001, and there were no employees working during this period. Mother offered documents from Automatic Data Processing, the company that processed the payroll for FNJ, reflecting that FNJ had payroll activity, however, between July 18, 2001 and October 31, 2001. Although Father testified that these documents were actually for payroll activity for the quarter prior to July 1, 2001, there is nothing in the record before this court to support his testimony.

Additionally, Father testified in his deposition and represented to Mother before trial that he had ceased operating his lawn care and snow removal business and had not done any work for this business in the year 2001. The reason Father gave for ceasing his lawn care and snow removal business was that his customers had "died or moved away to nursing homes," so he thought the "timing [was] perfect" to quit the business. Mother testified that she was mistakenly mailed a check for current lawn care service after the time that Father claimed he ceased doing business. When cross-examined at trial about when he stopped doing work for this business, Father testified that he quit only six weeks before the November 9, 2001, trial date. The reason Father gave for ceasing opera-

tions of his lawn care and snow removal business, which was that he did so because of market conditions, was similar to the reason he gave for ceasing operations of FNJ. The trial court could reasonably have found it incredible that outside economic circumstances had motivated Father to cease operating the two side businesses he had operated throughout the marriage and, furthermore, that these economic circumstances occurred at the same time which was, coincidentally, just prior to trial on the dissolution petition. A reasonable inference from Father's lack of candor as to when and why he allegedly ceased operating his side businesses is that Father was not testifying truthfully about these businesses in an effort to pay less child support.[1]

"[T]he trial court may impute income to a spouse according to the spouse's ability to earn by using his or her best efforts to gain employment suitable to the spouse's capabilities." *Leslie v. Leslie,* 827 S.W.2d 180, 183 (Mo. banc 1992). "Imputing income depends on the facts, determined case-by-case in the sound discretion of the trial court." *In re Marriage of Crow and Gilmore,* 103 S.W.3d 778, 783 (Mo. banc 2003). The relevant factors that the court is to consider in deciding whether to impute income and the amount of income to impute include:

(1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;

(2) The parent's occupational qualifications;

(3) The parent's employment potential;

(4) The available job opportunities in the community.

(5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

Civil Procedure Form No. 14, DIRECTIONS, COMMENTS FOR USE AND EXAMPLES FOR COMPLETION OF FORM NO. 14, Line 1: Gross Income, Comment H.

Applying the factors from Comment H to this case, the evidence regarding the first factor, Father's income history from FNJ, is that Father's average monthly income from FNJ was $769, for either the two years preceding trial or 2000 alone. Concerning the second factor, Father's occupational qualifications, the evidence is that Father had run FNJ for fifteen years and made a profit each year, which indicates that he was well-qualified to continue to do so. As for the third factor, the evidence is that the corporation remained a viable business entity, so Father's potential to obtain future income from the business existed. As to the fourth factor, the available job opportunities in the community, the evidence was that FNJ had a contract for fifteen years with the same company, Carondelet Health Campus, from which Father had earned an average of $769 per month over the last two years, but Father voluntarily chose not to re-bid for that contract and did not seek any other contracts for FNJ. The evidence on these factors,[2] when viewed in the light

1. From the judgment it is apparent that the trial court did not impute income from the lawn care and snow removal business to Father because there was no evidence of the amount of income Father had received from this business. Father's direct and cross-examination testimony about this business was still relevant, however, as it bore on his credibility, particularly concerning his side businesses.

2. The fifth factor is not relevant to the circumstances of the parties in this case.

most favorable to the trial court's judgment, supports the imputation of $769 per month in income from FNJ to Father.

It is not necessary to address all the issues raised in Judge Smith's concurring opinion because it is not binding precedent. I do wish to call attention to Judge Smith's failure to give deference to the trial court's right to believe some but not all of Father's testimony, in that he relies on the statement by Father that he did not bid on the Carondelet contract, in part, because of increased labor costs and competition. *See Hatchette,* 57 S.W.3d at 892. He also holds contrary to our standard of review when he reaches the conclusion that "[t]here simply is no evidence in the record from which the trial court could reasonably infer that the Carondelet contract, or any other existing contract for that matter, was voluntarily terminated by [Father]." In reaching that conclusion, he ignores Father's testimony that he did not submit a bid for the new Carondelet contract. The letter advising Father of the date that FNJ's contract with Carondelet terminates can be read as a recognition of the date that the contract with FNJ terminates and encouraging a smooth transition to the new janitorial service provider, which would be consistent with the termination of the contract because FNJ did not submit a bid. *Id.*

More importantly, I wish to object to Judge Smith's clarification and expansion on the law of imputation. As noted above, Judge Smith's characterization of the issue as the *involuntary* reduction of income of Father who, then, did not use his best efforts to obtain new employment is contrary to the standard of review. Next, even though Judge Smith recognizes that the imputation of income is to be done "on the facts of the individual case and [is] to be determined on a case-by-case basis" under Comment H of Line 1, he creates a distinction, not present in Comment H, between imputing income from an hourly-wage or salaried job and imputing income from a business contract and imposes a greater burden on custodial parents in the latter situation than Comment H imposes. He crafts a special requirement for income from business contracts not authorized by the Directions, Comments for Use and Examples For Completion of Form 14.

Judge Smith, essentially, is requiring Wife in this case to present direct evidence from a company to whom Father did not submit a bid, be it Carondelet Health Campus or some other company, detailing what the winning bid was and whether the company would have selected Father's bid if Father had, in fact, submitted a bid. Next, to show what the income realized from that bid might have been, Judge Smith is requiring Wife to present direct evidence as to what FNJ's expenses for the job would have been had Father bid and been successful.

In the context of imputing income from hourly-wage or salaried jobs, however, courts have never required a custodial parent to present evidence from a specific employer that if the non-custodial parent had submitted an employment application to that employer, the employer would have, in fact, hired the non-custodial parent and paid the non-custodial parent a specific amount of money. Such evidence from a prospective employer to whom the non-custodial parent did not even submit an application would be difficult, if not impossible, to obtain. Likewise, in this case, such evidence from a prospective company to whom Father did not even submit a bid would be equally difficult to obtain.

Even if such evidence could be obtained, however, it is not required to impute income on a Form 14. Comment H permits the amount of income and the likelihood of

receiving that amount of income to be inferred from the evidence on the factors listed. The first factor specifically states that in determining the amount of income to impute, the court is to consider "[t]he parent's *probable* earnings," and these "probable earnings" are to be based on the parent's work history during the three years preceding the trial or any other relevant time period. (Emphasis added.) The first factor does not require evidence of what the parent's *actual* income would have been if the parent had not deliberately reduced his or her income. From the second, third, and fourth factors, which are the parent's occupational qualifications, the parent's employment potential, and the available job opportunities in the community, the court can infer the likelihood that the parent could have obtained the probable earnings found in the first factor.

Comment H does not require direct evidence that had Father submitted a bid for the 2001 contract, the company would have accepted the bid, and the bid would have resulted in Father's realizing income in the precise amount of $769 per month. Rather, this conclusion can be reasonably inferred from such facts as (1) Father's average earnings from FNJ for the two years preceding trial were $769 per month; (2) Father had operated FNJ as one of only two shareholders for fifteen years; (3) FNJ had contracted to perform cleaning services for this particular company for the past fifteen years; and (4) the opportunity for FNJ to continue to contract with this company existed, but Father chose not to submit a bid. Such a conclusion does not require speculation, as Judge Smith asserts but, rather, is the result of the application of the factors listed in Com-

ment H to the evidence and inferences in the light most favorable to the trial court's judgment.

Courts have routinely upheld the imputation of income based upon such circumstantial evidence. For example, in *Hill*, although the husband was retired, the Supreme Court upheld the imputation of $70,000 in annual income to husband. 53 S.W.3d at 117.[3] At trial, the wife's expert had estimated, " 'conservatively,' 'entry-level' [that the husband] could earn between the mid-$40,000's to the mid-$60,000's." *Id.* For the three years before retirement, the husband had earned $114,000, $99,000, and $112,000. *Id.* Noting that the trial court disbelieved the husband's testimony that his retirement was planned and was done with the wife's "knowledge and consent," the Court found that the trial court did not err in imputing $70,000 in income to the husband. *Id.*

Likewise, in *Haden v. Riou,* 37 S.W.3d 854, 862 (Mo.App.2001), this court upheld the award of child support, which was based on the trial court's imputation of $4,000 in monthly income to the father. For the three years before trial, the father had an average monthly income of $4,055. *Id.* at 861. Four months before trial, he had lost the job at which he earned that income, through no fault of his own, and had started a new business repairing whirlpools and spas. *Id.* That business had been in operation for only one month and, for that month, the father testified that his gross receipts were $6,000 and his ordinary business expenses were $3,528.63. *Id.* at 862. Since there was evidence that the father had not been paid for all of the jobs he performed during the one month

---

**3.** *Hill* involved the imputation of income in calculating maintenance rather than child support. Nevertheless, " '[t]he principles relative to reduction and imputation of a spouse's income in child support cases are equally applicable in modification of maintenance cases.' " *Monnig v. Monnig,* 53 S.W.3d 241, 248 (Mo.App.2001) (quoting *Ramsey v. Ramsey,* 965 S.W.2d 365, 372 (Mo.App. 1998)).

and he testified to all amounts from memory, this court found that the trial court could have found that his monthly income from his business was "somewhat greater" than that testified to by the father. *Id.* In addition, the court relied on the circumstances of the father's prior average monthly income, his "substantial occupational qualifications, good employment potential, and that a need existed in the community for his services" to support the imputation of income in the amount of $4,000 per month. *Id.* There was no direct evidence in the record that the father would earn $4,000 per month in the future. This court recognized, however, that it is permissible for the trial court to make reasonable inferences of earning potential from the facts and circumstances of the case.[4]

In addition, the case Judge Smith cites for the proposition that the imputation of income cannot be based on speculation, *Monnig v. Monnig,* 53 S.W.3d 241, 246–47 (Mo.App.2001), is distinguishable from this case. In *Monnig,* the trial court imputed income to the husband in an amount that was more than double the minimum wage that the husband had earned from two part-time, temporary positions. *Id.* This court found that there was no evidence to support the trial court's finding that the husband possessed the education or skills to earn the imputed income amount, nor was there any evidence to support the trial court's finding that the type of work husband was doing on a part-time, temporary basis was available on a permanent basis

for a greater rate of pay. *Id.* at 246. Without such evidence, this court concluded that the trial court's imputed income amount was based "solely on speculation." *Id.* at 247. Here, the imputed income amount in this case is not based on speculation but, rather, is based solely on the average of what Father's established business had earned in the last two years of a contract that the business had secured for fifteen years before Father chose not to re-bid for that contract. In this case, the facts, and the reasonable inferences from the facts, support finding that Father deliberately limited FNJ's work to reduce his income and, by his best efforts, Father could earn at least $769 per month from FNJ Maintenance Company.

Finally, Judge Smith indicates that a question is raised as to whether an automatic modification in child support is proper, based on an automatic modification in maintenance. The mere raising of the issue could be read to infer that such a practice may be improper. Any such inference should not be taken as indicating to the parties, the bench, or the bar any position of this court as to the resolution of the issue because it has not been raised, briefed, or decided in this case.

Accordingly, I would find that there is sufficient evidence in the record to support the imputation of income to Father of $769 per month, which figure should be utilized by the trial court, upon remand, when it reconsiders whether the presumed child

---

4. Other examples of this court upholding the imputation of income based upon circumstantial evidence include *State ex rel. Stirnaman v. Calderon,* 67 S.W.3d 637, 639–41 (Mo.App. 2002) and *Word v. Peterson,* 57 S.W.3d 894, 901–02 (Mo.App.2001). That these cases, as well as *Hill* and *Haden,* involved imputing income from a primary job rather than a side business is inconsequential. The directions to Line 1: Gross Income, state that "earnings from secondary employment ... may be included, in whole or in part, in 'gross income' in appropriate circumstances." Since the appellant had operated a side business for the entire time the parties were married, it was appropriate for the trial court to include earnings from his secondary employment in the calculation of his gross income for child support purposes.